**Case No. 22-50673**

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

Angela Robinson, Individually; Clara Busby, as next friend,
guardian, and parent of and for minors L.H. and T.H.; Rachel
Ambler, as independent Administrator of, and on behalf of,
Angela Robinson, minors L.H. and T.H., the Estate of Savion
Vashon Hall, and Savion Vashon Hall's heirs at law,

Plaintiffs - Appellants

v.

Midland County, Texas; Daniel Stickel,

Defendants – Appellees

---

On Appeal from
United States District Court for the Western District of Texas
7:21-CV-111

---

**Brief of Appellants**

Bruce K. Thomas
Law Office of Bruce K. Thomas
Texas State Bar No. 19844300
bthomas@bthomaslaw.com
12900 Preston Rd, Ste 590
Dallas, Texas 75230
Phone/Fax:  (214) 296-9650

T. Dean Malone
Law Offices of Dean Malone, P.C.
Texas State Bar No. 24003265
dean@deanmalone.com
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:      (214) 670-9904
ATTORNEYS FOR APPELLANTS

**ORAL ARGUMENT REQUESTED**

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5ᵗʰ CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellants: | Counsel for Plaintiffs-Appellants: |
| --- | --- |
| Angela Robinson, Individually; Clara Busby, as next friend, guardian, and parent of and for minors L.H. and T.H.; Rachel Ambler, as independent Administrator of, and on behalf of, Angela Robinson, minors L.H. and T.H., the Estate of Savion Vashon Hall, and Savion Vashon Hall's heirs at law. | T. Dean Malone Michael T. O'Connor Kristen Leigh Homyk Brandie A. Moser Jordan A. Shannon of Law Offices of Dean Malone, P.C., Dallas, TX<br><br>Bruce K. Thomas of Law Office of Bruce K. Thomas, Dallas, TX |

| Defendants – Appellees: | Counsel for Defendants-Appellees: |
| --- | --- |
| Midland County, Texas; Daniel Stickel. | Miles Nelson and Richard Rouse of Shafer, Davis, O'Leary & Stoker, Incorporated, Odessa, TX |

| Other Interested Parties (Settling Defendants): | Counsel for Other Interested Parties: |
| --- | --- |
| Soluta, Inc.; Adeola C. Adesomi. | Christopher G. Rigler of Thompson, Coe, Cousins & Irons, L.L.P., Dallas, Texas 75201<br><br>Zandra E. Foley and Cory S. Reed |

| | |
|---|---|
| | of Thompson, Coe, Cousins & Irons, L.L.P., <br> Houston, Texas 77056 |
| Flor Estrada | Ronald A. Ortman <br> of Ortman Law Firm, PLLC, <br> San Antonio, Texas |
| Timothy Gene Forbush, Jr. | Carl David Adams, <br> Dallas, TX |
| Esther Ebele Ihediwa | Wesson H. Tribble and <br> Monica C. Vaughan <br> of Tribble \| Ross, <br> Houston, Texas |
| Lilian Kerubo Okeri | Jonathan C. LaMendola <br> of Cobb Martinez Woodward PLLC, <br> Dallas, Texas |
| Kelly V. Robins | Denis Dennis and Darrell W. Corzine <br> of Kelly, Morgan, Dennis, Corzine & Hansen, <br> Odessa, Texas |

/s/ Bruce K. Thomas
Attorney of record for Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument. This appeal presents important issues concerning the nondelegable constitutional duties of counties for the safe operation of jails when counties engage private contractors to perform important jail functions. It further involves the responsibility of jailers to provided protection and medical care for critically ill detainees before the detainee's condition becomes critical and unrecoverable. These issues deserve the full vetting of oral argument.

## TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS**....................................................**2**

**STATEMENT REGARDING ORAL ARGUMENT**...........................................**4**

**TABLE OF CONTENTS**...................................................................................**5**

**TABLE OF AUTHORITIES**.............................................................................**8**

**JURISDICTIONAL STATEMENT**.................................................................**11**

**STATEMENT OF ISSUES**.............................................................................**12**

**STATEMENT OF THE CASE**........................................................................**13**

A.       Pleaded Facts. .............................................................................13

B.       Procedural History. ......................................................................22

**SUMMARY OF THE ARGUMENT**...............................................................**23**

**ARGUMENT**..................................................................................................**26**

**ISSUE 1:  Midland County has a nondelegable constitutional duty to provide medical care to its detainees. Midland County purported to delegate medical care for its jails to a private contractor, Soluta. Plaintiffs pleaded plausible claims demonstrating that Soluta, as a delegee of Midland County and co-policymaker, adopted and implemented unconstitutional policies, practices, and/or customs that were a moving force in the suffering and death of**

**detainee Savion Vashon Hall, including failing to obtain and thereafter fabricating oxygen saturation levels for patients. The district court erred in dismissing Plaintiffs' claims against Midland County which are based on the unconstitutional conduct of its contractor............................................................26**

A.    Legal Standards ...........................................................26

    1.    Pleading Standards. ..................................................26

    2.    *Monell* Liability. .......................................................27

B.    Midland County's *Monell* Liability................................29

**ISSUE 2:  The district court erred in dismissing Plaintiffs' claim against Jailer Daniel T. Stickel because Plaintiff pleaded a plausible claim which defeats qualified immunity. Checking a critically ill detainee only to determine if he is still breathing, and refusing to declare a medical emergency unless the critically ill detainee becomes "unresponsive" or has "lost consciousness," is deliberately indifferent to the detainee's constitutional right to treatment for serious medical needs............................................................39**

A.    Introduction and standard of review..............................39

    1.    Pleading Standards. ..................................................39

    2.    Serious medical needs and protection from harm. ..................39

    3.    Qualified Immunity. ..................................................42

4.    Preservation of error in the event of en banc or Supreme Court review:

*An objective standard should apply to all pretrial detainee claims.* ................44

B.    Defendant Stickel's constitutional violation. .................................................47

C.    Defendant Stickel violated clearly established law. ......................................60

**CONCLUSION**..............................................................................................**65**

**CERTIFICATE OF SERVICE** ........................................................................**66**

**CERTIFICATE OF COMPLIANCE** ................................................................**67**

# TABLE OF AUTHORITIES

## Cases

*Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 209 (5th Cir. 2009)....................26

*Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422–23 (5th Cir. 2017)
........................................................................................................ 42, 48, 60

*also Delaughter v. Woodall*, 909 F.3d 130, 140 (5th Cir. 2018)............................62

*Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) .........................28

*Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985)..............30

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ...................................................43

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).....................................................26, 46

*Baldwin v. Dorsey*, 964 F.3d 320, 327-28 (5th Cir. 2020) ......................................63

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).....................................26, 46

*Bell v. Wolfish*, 441 U.S. 520, 535, (1979) .......................................................28, 40

*Brawner v. Scott Cty., Tennessee*, 14 F.4th 585, 592-97 (6th Cir. 2021)................45

*Bruno v City of Schenectady*, 727 F Appx 717 (2nd Cir. 2018) ...............................45

*Carswell v. Camp*, 37 F.4th 1062, 1067 (5th Cir. 2022) .........................................46

*Castro v Cnty. of Los Angeles*, 833 F3d 1060 (9th Cir. 2016) (en banc), *cert denied*
137 S Ct 831 (2017).............................................................................................45

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).....................................28

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). ....................................30

*Converse v. City of Kemah, Tex.*, 961 F.3d 771, 775 (5th Cir. 2020) ......... 40, 41, 52

*Cope v. Cogdill*, 3 F.4th 198, 207, n. 7 (5th Cir. 2021) ), *cert. denied*, 142 S. Ct.
2573 (2022)................................................................................ 40, 42, 45, 46

*Darnell v Pineiro*, 849 F3d 17 (2nd Cir. 2017)........................................................45

*Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)........................................27

*Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). 40, 41

*Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 208-09 (5th Cir. 2011) .......................32

*Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006).................................. 41, 49, 61

*Farmer v. Brennan*, 511 U.S. 825, 837, 842 (1994)................................................41

*Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985)..................... passim

*Harris v. Clay Cnty., Mississippi*, 47 F.4th 271, 278 (5th Cir. 2022) ....................38

*Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994)..............................41

*Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1186-87 (11th Cir.
1994) ......................................................................................................... 42, 49

*Hope v. Pelzer*, 536 U. S. 730, 741 (2002) .................................................43

*Hughes v. The Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001) ...................27

*Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000).............52

*King ex rel. Estate of King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) .........30

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) .........................................46

*Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997)....... 42, 49

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168–69 (1993)..................................................................29

*M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 254 (5th Cir. 2018)....................29

*McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) .......................43

*McCoy v. Alamu*, 950 F.3d 226, 231 n.3, 234 (5th Cir. 2020), *cert. granted, judgment vacated*, 141 S.Ct. 1364 (2021) ............................................44

*Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).........................................41

*Miranda v Co of Lake*, 900 F3d 335 (7th Cir. 2018) ...............................................45

*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978) .. 31, 36

*Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 510 n.56 (5th Cir. 2022) ........34

*Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999)...............27

*Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).............. 28, 32, 35

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) .................38

*Rodriguez v. S. Health Partners, Inc.*, No. 3:20-CV-0045-D, 2020 WL 7056336, at *13 (N.D. Tex. Dec. 2, 2020) ...................................................... 30, 31

*Roque v. Harvel*, 993 F.3d 325, 331 (5th Cir. 2021) ...............................................61

*Sanchez v. Young County, Tex.*, 866 F.3d 274, 279 (5th Cir. 2017)................. 27, 40

*Sanchez v. Young Cty., Tex.*, 956 F.3d 785, 791 (5th Cir. 2020)...................... passim

*Scott v. Moore*, 114 F.3d 51, 53 n.2 (5th Cir. 1997)......................................... 28, 45

*Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009) .............................31

*Sims v. Griffin*, 35 F.4th 945, 951 (5th Cir. 2022).......................................... 41, 61

*Strain v. Regalado*, 977 F.3d 984, 990-93 & n.6 (10th Cir. 2020), *cert. denied*, 142 S. Ct. 312 (2021) ..................................................................................45

*Tamez v. Manthey*, No. CV B-07-213, 2008 WL 11451445, at *8 (S.D. Tex. Sept. 18, 2008) ................................................................................ 42, 49

*Taylor v. Riojas*, 141 S.Ct. 52, 53-54 (2020) (per curiam)......................................43

*Thomas v. City of Galveston, Tex.*, 800 F. Supp. 2d 826, 842-43 (S.D. Tex. 2011) ............................................................................................................28

*Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 456 (5th Cir. 2001) ........................43

*Timpa v. Dillard*, 20 F.4th 1020, 1030-40 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2755 (2022) ................................................................................. 59, 62

*Tyson v. Sabine*, 42 F.4th 508 (5th Cir. 2022) ........................................44

*United States v. Lanier*, 520 U. S. 259, 271 (1997)..................................44

*Valderrama v. Rousseau*, 780 F.3d 1108, 1120 (11th Cir. 2015)...........................41

*Wade v. Daniels*, 36 F.4th 1318, 1327-28 (11th Cir. 2022) ....................................42

*West v. Atkins*, 487 U.S. 42, 56 (1988) ....................................................31

*Westmoreland v. Butler Cnty.*, 29 F.4th 721, 727-29 (6th Cir. 2022) ................ 45, 46

*Whitney v City of St. Louis*, 887 F.3d 857 (8th Cir. 2018)........................................45

*Wright v. West*, 505 U.S. 277, 296 (1992) ................................................................38

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................26

Fed. R. Civ. P. 12(c)..................................................................... 11, 22, 26, 27

## JURISDICTIONAL STATEMENT

This is an appeal from a final order of dismissal after the district court granted Defendants' Rule 12(c) motion. This Court has jurisdiction pursuant to 28 U.S.C. §1291.

**STATEMENT OF ISSUES**

ISSUE 1:    Midland County has a nondelegable constitutional duty to provide medical care to its detainees. Midland County purported to delegate medical care for its jails to a private contractor, Soluta. Plaintiffs pleaded plausible claims demonstrating that Soluta, as a delegee of Midland County and co-policymaker, adopted and implemented unconstitutional policies, practices, and/or customs that were a moving force in the suffering and death of detainee Savion Vashon Hall, including failing to obtain and thereafter fabricating oxygen saturation levels for patients. The district court erred in dismissing Plaintiffs' claims against Midland County which are based on the unconstitutional conduct of its contractor.

ISSUE 2:    The district court erred in dismissing Plaintiffs' claim against Jailer Daniel T. Stickel because Plaintiff pleaded a plausible claim which defeats qualified immunity. Checking a critically ill detainee only to determine if he is still breathing, and refusing to declare a medical emergency unless the critically ill detainee becomes "unresponsive" or has "lost consciousness," is deliberately indifferent to the detainee's constitutional right to treatment for serious medical needs.

## STATEMENT OF THE CASE

A.   Pleaded Facts.

Savion Hall was arrested and taken to the Midland County jail on June 21, 2019. (ROA.27 [¶18[1]]) Intake forms stated that Hall had been hospitalized recently and contained the handwritten notation: "06/20/19 due to breathing problem." (ROA.27 [¶18]) The intake records also showed that Hall was prescribed Prednisone, had a chronic illness, and suffered from asthma and shortness of breath. (ROA.27 [¶18]) A progress note at intake stated that Hall's vital signs were within normal limits. (ROA.27 [¶18]) Although it is unknown to Plaintiffs whether the information is accurate, at intake Hall's oxygen saturation level was listed at 99% and his blood pressure at 127/74. (ROA.27 [¶18])

Ten days later, on July 1, 2019, Hall was transported to a hospital emergency room for issues related to his asthma. (ROA.27-28 [¶19]) Discharge instructions included the instruction that Hall return to the emergency department for further evaluation if his symptoms worsened. (ROA.27-28 [¶19]) Jail personnel recognized that Hall's condition was serious, and on July 9 Hall was assigned a lower bunk due to his medical diagnosis for asthma. (ROA.27-28 [¶19])

While Hall was incarcerated at the Midland County jail, a private contractor, Soluta, Inc., provided medical care at the jail pursuant to a contract with Midland

---

[1] Paragraph references are to Plaintiffs' Original Complaint (ROA.15-85).

County. (ROA.27, 29-30, 49, 63-64 [¶¶18, 23, 65, 87, 88]) Hall purportedly received a number of SVN (small volume nebulizer[2]) breathing treatments from several Soluta nurses. (ROA.29-30 [¶23]) Soluta kept an SVN Treatment Flo-Sheet purporting to record oxygen saturation levels and breathing observations allegedly obtained at the time of treatment. (ROA.29-30 [¶23]) Columns are provided to record oxygen saturation levels both before and after treatment. (ROA.29-30 [¶23]) Additional columns are provided to record bronchial breath sounds before and after treatment. (ROA.29-30 [¶23]) To obtain the oxygen saturation readings, nurses were required to use a pulse oximeter, or O2 meter, which is a commonly-used finger-clip device. (ROA.31, 33-35, 47-48, 49-51 [¶¶ 25, 32-34, 59, 66]) Additionally, Soluta nurses were required to use a stethoscope to listen to bronchial breath sounds, such as wheezing, which is relevant to the patient's lung and breathing condition. (ROA.33-34, 49-51, 51-53, 61-62 [¶¶ 32, 66, 69, 82])

At least six Soluta nurses purported to participate in providing SVN treatments to Hall. (ROA.29, 29-30, 33, 36, 46, 47, 48-49, 59-61 [¶¶ 22, 23, 31, 36, 56, 58, 63, 79]) Treatments occurred in an area that was monitored by video surveillance, and no treatments occurred out of camera view. (ROA.59-61 [¶79]) As determined during the criminal investigation into Hall's death by the Texas Rangers,

---

[2] A nebulizer machine turns liquid (typically an albuterol solution) into vapor. (ROA.49-51 [¶¶ 66, 68])

video evidence shows that the nurses rarely used the necessary pulse oximeter to obtain Hall's oxygen saturation levels, either before or after his SVBN treatment. (ROA.51-53, 59-61 [¶¶69, 78, 79]) Video evidence shows approximately 60 total treatments between June 24 and July 11, 43 of which were not logged in the SVN Treatment Flo-Sheet. (ROA.59-60 [¶79 (Item 2.5)]) Eleven times there was no nurse involvement and Hall administered his own medication. (ROA.59-60 [¶79 (Items 2.4, 2.5)]) Out of the 60 treatments, Hall's O2 levels were checked only 7 times before treatment, and just 2 times after treatment. (ROA.60 [¶79 (Item 2.6)]) For none of the entries made on the SVN Treatment Flo-Sheet did nurses use a pulse oximeter to obtain the purported readings. (ROA.51-53 [¶69]) For only two readings on the Flo-Sheet was the proper procedure somewhat followed: (1) when EMS was called on July 1 when Hall was transported to the hospital; and (2) when Hall was examined on July 11 by Dr. David Willingham, a family practice practitioner who provided sick-call medical services to Soluta on a contract basis. (ROA.49, 52 [¶¶ 65, 69 (Ranger comments at p. 38)])

Likewise, the nurses never used a stethoscope to obtain the purported observations of Hall's lungs. (ROA.35, 40, 48, 51-53, 59-61, 61-62 [¶¶ 34, 43, 61, 69, 79, 82]) Without using the pulse oximeter and a stethoscope, it was impossible to obtain the readings the SVN Treatment Flo-Sheet purports to show. (ROA.33-34, 35, 51-53, 60 [¶¶ 32, 34, 69, 79 (Item 14.10)]) Nurse Forbush, who represented

15

himself as Soluta's "go-to-guy for everything," admitted that the nurses made entries on the SVN Treatment Flo-Sheet well after the treatment occurred, even though they should not. (ROA.43 [¶¶48, 50]) For all days but July 11, when Hall was transferred to a hospital on order of Dr. Willingham, the SVN Treatment Flo-Sheet purports to show healthy and stable oxygen levels at 95% or greater, which allegedly improved with treatment. (ROA.29-30, 50 [¶¶23, 66 (Willingham comments at p. 37)])

As noted in an exchange between Ranger Gray and Dr. Willingham, the purpose of keeping the SVN Treatment Flo-Sheet was to note trends in the patient's condition, including whether the patient's condition was deteriorating over time. (ROA.51-53 [¶69]) If accurate entries are not recorded by nurses on the Flo-Sheet, a physician reviewing the SVN Treatment Flo-Sheet will be unable to observe a deteriorating condition and timely act to provide further or alternative treatment. (ROA.51-53 [¶69]) This occurred here. (ROA.59-61 [¶79])

The Texas Rangers investigation include the following conclusions:

14.7. Evidence showed that six (6) nurses who have been identified in this file, had fabricated information on a governmental document. Video evidence showed the nurses had fabricated vital signs and medical checks with regards to Hall's oxygen levels, and breathing examinations.

14.12. The six (6) nurses identified in this file, fabricated a key medical record with regards to Savion Hall, namely the SVN Flo Sheet. This record is used to document Halls long and short term breathing care. Without this information being correct, Doctor Willingham stated he would not be able to make an accurate diagnosis of medical treatment needed.

(ROA.60 [¶79])

On July 11, following several hours of delay in treatment and unnecessary suffering by Hall caused by Defendant Daniel T. Stickel, discussed *infra*, Hall was allowed to see Dr. Willingham. (ROA.56-57 [¶76]; ROA.59-61[¶79]) Willingham summoned EMS which transported Hall to a local hospital for emergency treatment. (ROA.51-53, 54-55, 59-61 [¶¶69, 70, 74, 79]) EMS recorded Hall's blood oxygen level at a critically low 77% (ROA.53-54 [¶71]) Similarly, Hall's blood pressure was alarmingly low: 77/68. Paramedics further rated Hall at a sub-normal 14 on the Glasgow Coma Scale, noting that Hall was confused and disoriented as to time, place, and person. (ROA.53-54 [¶71]) Hall's condition had deteriorated to the point that it was unrecoverable, and Hall died in the hospital on July 19, at age 30. (ROA.26, 54 [¶¶16, 73])

Unlike Hall's first visit to the hospital on July 1, Midland County discharged Hall from custody after Hall was transported to the hospital on July 11. (ROA.54 [¶72]) By doing so, Midland County sought to avoid liability for another jail death; keep Hall's autopsy from becoming public; and avoid being charged for Hall's treatment. (ROA.54-55 [¶¶72, 74])

On the evening of July 10 and the morning of July 11, Midland County jailer Daniel T. Stickel was assigned to the guard station in the J Block where Hall was held. (ROA.55-58 [¶76]) Pursuant to Midland County policy, detainees with

breathing difficulties were housed at an extreme distance from the medical facility and have difficulty walking the distance to obtain treatment. (ROA.38-40 [¶¶41-42]) In connection with the Midland County Sheriff's Department investigation into Hall's death, Stickel prepared three supplemental reports: one "Inmate Injury" report, and two "Medical Referral Reports." (ROA.55-58 [¶76]) Stickel acknowledged that this purported information should have been recorded at the time of the events but was not. (ROA.55-58 [¶76]) In the Inmate Injury Report, Stickel states:

> THIS HAS BEEN LOGGED LATE DUE TO A COMMON KNOWLEDGE OF INMATE HALL CONSISTENTLY BEING IN MEDICAL FOR BREATHING TREATMENTS THROUGHOUT THE NIGHT. ALTHOUGH NOT AN EXCUSE, FOR THIS REASON I DID NOT INCLUDE THIS WITHIN MY LOGS.

(ROA.56 [¶76 (Capital letters in original)]). Similarly, the first Medical Referral contains the notation: "THIS INCIDENT WAS REPORTED LATE.;" and the second includes the notations: "*LATE ENTRY*" and "LOGGED LATE." (ROA.57-58 [¶76])¶

In these late reports prepared well after the events in question, Stickel claims that Hall approached him and stated that he needed to "go back down to medical for another breathing treatment." (ROA.56 [¶76 (Medical Referral at p. 42)]) Stickel states that he observed that Hall was "having trouble breathing" and "wheezing for air." (ROA.56 [¶76 (Medical Referral at p. 42)]) Stickel further states, "DUE TO

PRIOR KNOWLEDGE FROM WORKING WITHIN THE SPECIAL HOUSING UNIT I KNEW THAT THE ON-DUTY NURSE WOULD NOT ALLOW FOR INMATE HALL TO RETURN TO MEDICAL WITHIN 4-5 HOURS OF HIS LAST TREATMENT." (ROA.56 [¶76 (Medical Referral at p. 42)]) Stickel states that he sought to verify the information with another officer who offered the same information. (ROA.56 [¶76 (Medical Referral at p. 42)]) Stickel told Hall that this was the "protocol," and sent Hall back to his assigned housing. (ROA.56 [¶76 (Medical Referral at p. 42)]) Stickel additionally states that he checked on Hall multiple times and confirmed that "he was breathing, although with difficulty." (ROA.56-57 [¶76 (Medical Referral at pp. 42-43)]) Stickel reported that Hall told him that "he 'was not gonna make it' as in reference to him about to pass out." (ROA.56 [¶76 (Medical Referral at p. 43)]) ¶

Hall again approached the guard station at approximately 6:15 a.m. seeking assistance. (ROA.57 [¶76 (Medical Referral at p. 43)]) Stickel noted that Hall was "wheezing and having trouble breathing," and he "leaned on the guard station in a manner suggesting he was having trouble maintaining his ability to stand and was close to passing out." (ROA.57 [¶76 (Medical Referral at p. 43)]) Hall again stated that he "was not gonna make it." (ROA.57 [¶76 (Medical Referral at p. 43)]) Stickel repeated the alleged protocol of waiting 4 to 5 hours between breathing treatments. (ROA.57 [¶76 (Medical Referral at p. 43)]) Stickel states that he called the special

housing unit (apparently the jail's term for an infirmary), but he received no answer and did not try again. (ROA.57 [¶76 (Medical Referral at p. 43)]) Stickel noted an inhaler in Hall's hand and claims he asked Hall if he was out of medication, and Hall stated he was not. (ROA.57 [¶76 (Medical Referral at p. 44)]) Stickel further wrote that "the situation gave me nerves" and considered whether to call a medical emergency, but did not. (ROA.57 [¶76 (Medical Referral at p. 44)]) Stickel additionally stated:

> UPON RECOLLECTION OF THE SITUATION, AS A SECURITY OFFICER, I SHOULD HAVE GUARANTEED WHAT THE CALL SHOULD HAVE BEEN BY CONTACTING MEDICAL UNTIL THEY ANSWERED. BY GOING OFF OF MY BEST JUDGEMENT WITH THE INFORMATION I HAD BEEN GIVEN **I WAS NOT GOING TO CALL A 'MEDICAL EMERGENCY' UNLESS INMATE HALL BECAME UNRESPONSIVE OR LOST CONCIOUSNESS** (sic).

(ROA.58 [¶76 (Medical Referral at p. 44 [emphasis added]).

Shortly before 7:00 a.m., Officer Clark reported for her shift as Stickel's relief and instructed Stickel to take Hall to medical for a breathing treatment. (ROA.57 [¶76 (Medical Referral at p. 43)])  This was an hour and a half before the time that Stickel claims to have believed Hall was permitted another breathing treatment. (ROA.55-58 [¶76 (Medical Referrals at pp. 41-44)]) As noted *supra*, this is when Hall saw Dr. Willingham, who called EMS. (ROA.51-53, 59-61[¶¶69, 79]) Nowhere in his reports does Stickel claim to have talked to *any* medical professional regarding Hall's condition as Stickel observed it throughout the night, or to have reported or

relayed to the medical staff Hall's critical breathing difficulties, Stickel's observation that Hall was having difficulty standing and was close to passing out, or Hall's repeated warnings that he "was not gonna make it" if he did not receive medical treatment. (ROA.55-58 [¶76 (Medical Referrals at pp. 41-44)])

Pursuant to Midland County policy, Stickel was operating pursuant to a temporary jailer's license. (ROA.49, 66 [¶¶64, 94]) A temporary jailer's license requires no training. (ROA.66 [¶94]) At the time of these events, Stickel had only 6 weeks experience working at a jail and had received no training. (ROA.66 [¶94]) Nonetheless, Midland County put Stickel in charge of the J Block guard station. (ROA.55-58 [¶76 (Medical Referrals at pp. 41-44)])

Plaintiffs allege that due to the sheer number of Soluta employees acting at the behest of Soluta and Midland County who falsified records in the same way, failed to provide the same medical treatment to Hall, and took other actions referenced in Plaintiffs' complaint, that what occurred to Hall was the product of unwritten policies, customs, and practices of Soluta and Midland County with regard to inmates in the Midland County jail. (ROA.64-65 [¶91])

Plaintiffs additionally allege that several Midland County/Soluta policies, practices, and/or customs, alone or in interaction with one another, were a moving force in causing Hall's suffering and death. (ROA.64 [¶ 89]) These include understaffing medical personnel at the Midland County jail and underserving those

it detained in order to save money (ROA.54, 65 [¶¶72, 92]); employing and placing in positions of responsibility jailers with temporary jail licenses who have little or no training (ROA.65-66 [¶93]); allowing jailers not to call a medical emergency, and thus not to obtain EMS or other appropriate medical personnel, unless and until an inmate was unresponsive or unconscious (ROA.66 [¶94]); and housing prisoners, such as Hall, and who needed continuous and vitally important medical care too far from the medical station. (ROA.64 [¶90]) Plaintiff further alleges that Midland County's unwritten policies, customs, and practices as alleged in the Complaint were adopted and maintained with deliberate indifference to detainee safety, and alone or in combination were a moving force in causing Hall's pain, suffering, and death. (ROA.19-25, 54, 62, 63, 64, 80-81 [¶¶4-12, 72, 83, 86, 89, 120, 122, 123]) These policies alone and/or in combination with others also contributed to a history of jail deaths. (ROA.66-69 [¶¶ 95-104])

B.    Procedural History.

The Midland County Defendants (Midland County, Texas and Daniel T. Stickel) answered Plaintiffs Complaint (ROA.172-210), then subsequently filed a Rule 12(c) motion to dismiss. (ROA.245-266) Plaintiffs responded (ROA.320-344) and the Midland County Defendants replied. (ROA.360-371) Thereafter, the Court granted the Midland County Defendants' motion to dismiss. (ROA.631-654) Plaintiffs reached a settlement with the remaining Defendants (i.e., Soluta, Inc. and

six Soluta nurses), and Plaintiffs' claims against these Defendants were dismissed pursuant to the terms of the settlement agreement. (ROA.678-683) Thereafter the district court rendered a Final Order of Dismissal, and Plaintiffs appealed the ruling on the motion to dismiss. (ROA.685, 691-95)

## SUMMARY OF THE ARGUMENT

Midland County has a nondelegable constitutional duty to provide medical care to its detainees. It cannot avoid its constitutional duties by contracting with a private entity and delegating its policymaking authority to it. Midland County remains liable for the unconstitutional policies and customs adopted by its delegee, Soluta. There is no issue of respondeat superior vis-à-vis Midland County and Soluta. Both Soluta and Midland County equally bear *Monell* liability as co-policymakers. That Soluta's nurses acted as a matter of policy and accepted custom is evident from the fact that each of a half dozen nurses all acted similarly numerous times over the course of several days. On more than 50 occasions they failed to use pulse oximeter to obtain Savion Hall's actual oxygen saturation levels, and also failed to use stethoscopes to determine Hall's breathing impairment and lung function. Instead, they simply made up misleading oxygen readings and fabricated observations day after day purporting to show that Hall was responding positively to treatment, when instead he was becoming increasingly ill, and died. Not one employee objected, questioned, or refused to participate in this practice. When so

many employees engage in the same unlawful conduct at the same time, a factfinder can and should conclude that they acted pursuant to governmental policy.

In a final desperate act to avoid its responsibility for another jail death, Midland County discharged Hall from custody as Hall was dying in the hospital. This is anything but exculpating. Midland County's conduct could not speak louder of its complicity in Soluta's custom and policy of denying detainees critically needed medical care and its attempt to conceal the facts.

Similarly, Midland County's jailer, Defendant Daniel Stickel, was deliberately indifferent to Hall's critical, deteriorating condition. Twice Stickel ignored Hall's pleas that he was "not gonna to make it" without further medical treatment. Although Hall's critical condition was obvious, Hall could not have been plainer in telling Stickel that Hall believed he was going to die if he did not receive medical help. Even in Stickel's attempted self-serving statements made after the fact, in which he attempted to rationalize his misconduct, Stickel acknowledged that he knew Hall was suffering and that his condition constituted an emergency. Stickel, however, made the conscious decision not to declare an emergency unless and until Hall reached the critical point of losing consciousness. Thus, Stickel admitted that he delayed emergency medical treatment for an obviously suffering and ill detainee, waiting until the detainee's condition became immediately life-threatening and potentially unrecoverable. Stickel's admission concedes deliberate indifference and

defeats qualified immunity. Defendants' attempt to ascribe Stickel's decisions to alleged reliance upon medical advice from Soluta nurses is a red herring. This is an unsupported embellishment of the record which collapses and misstates events, indulges inferences in favor of Defendants, and violates the standard of review. Even if the argument had factual support, Defendants' theory would at most raise a fact issue as to Stickel's credibility. In fact, Stickel did not even claim to have inquired about or obtained any advice from *any* medical professional regarding Hall's deteriorating condition. Instead, he ignored Hall's pleas that he was "not gonna make it," and defined a medical emergency in the most absurd terms: losing consciousness. Such meager attempts to provide assistance as Stickel may have made, i.e., checking if Hall was breathing and asking if his inhaler was empty, fall far short of Stickel's constitutional obligations.

# ARGUMENT

ISSUE 1:   Midland County has a nondelegable constitutional duty to provide medical care to its detainees. Midland County purported to delegate medical care for its jails to a private contractor, Soluta. Plaintiffs pleaded plausible claims demonstrating that Soluta, as a delegee of Midland County and co-policymaker, adopted and implemented unconstitutional policies, practices, and/or customs that were a moving force in the suffering and death of detainee Savion Vashon Hall, including failing to obtain and thereafter fabricating oxygen saturation levels for patients. The district court erred in dismissing Plaintiffs' claims against Midland County which are based on the unconstitutional conduct of its contractor.

A.    Legal Standards

1.    Pleading Standards.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint "does not need detailed factual allegations," but the facts alleged "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Rule 12(c) states that after the pleadings are closed, but early enough not to delay trial, a party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 209 (5th Cir. 2009) (internal quotations omitted). "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a

valid claim for relief." *Hughes v. The Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001) (internal quotations omitted).Thus, the inquiry focuses on the allegations in the pleadings and not on whether the plaintiff actually has sufficient evidence to succeed on the merits. *Ackerson*, 589 F.3d at 209.

This Court reviews de novo a district court's grant of judgment on the pleadings under Rule 12(c). *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

2.     *Monell* Liability.

A governmental entity can be held accountable for an episodic act or omission if: (1) the governmental employee was subjectively indifferent, and (2) the employee's act "resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff]'s constitutional rights." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).

The same facts may also give rise to governmental liability on a conditions of confinement theory, which the plaintiff may plead in the alternative. *Sanchez v. Young Cty., Tex.*, 866 F.3d 274, 279 n. 3 (5th Cir. 2017). "Practices that are 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct,' can represent official policy." *Sanchez v. Young Cty., Tex.*, 956 F.3d 785, 791 (5th Cir. 2020) "This is because pervasive practices can be evidence that the official policymaker knew of and acquiesced to the misconduct, making the

municipality culpable." *Id*. (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

In a conditions of confinement case, the reasonable relationship test set out in *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), should be applied. *Scott v. Moore*, 114 F.3d 51, 53 n.2 (5th Cir. 1997). A constitutional violation exists if the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective. *Id*. (citing *Bell*, 441 U.S. at 539). Therefore, "[t]he issue is whether the conditions 'amount to punishment.' " *Young Cty.*, 956 F.3d at 791.

The plaintiff must show that a municipal policy was the moving force behind the violation. *See Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018). That is, Plaintiffs must show a causal link between the policy and the violation. *Piotrowski*, 237 F.3d at 580. For a policy to be a moving force behind the violation of a constitutional right, the failure of the policy or omission must be "closely related to the ultimate injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989). It is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery. *Thomas v. City of Galveston, Tex.*, 800 F. Supp. 2d 826, 842-43 (S.D. Tex. 2011). "Where a plaintiff provides more than a boilerplate recitation of the grounds for municipal liability, and instead makes some additional allegation to put the municipality on fair notice of the grounds for which it is being

sued, 'federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims . . . ..' " *Thomas*, 800 F. Supp. 2d at 844–45 (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168–69 (1993)).

Policies should not be viewed in isolation but should be considered in the context of how policies interact with one another. *See Young Cty.*, 956 F.3d at 796 ("Given the different, compounding ways that these alleged policies might interact, a jury could reasonably conclude that they had a 'mutually enforcing effect' that deprived decedent pretrial detainee of needed medical care."); *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 254 (5th Cir. 2018) ("Courts 'may . . . consider how individual policies or practices interact with one another within the larger system.' ").

A plaintiff can prove the existence of a de facto policy through the "consistent testimony of jail employees," or when the policymaker knows about a misconduct yet fails to take remedial action or discipline employees. *Sanchez*, 956 F.3d at 793-94 (citing, *inter alia*, *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985)). Similarly, when several employees behave similarly in response to the same situation, it is reasonable to conclude that their conduct is a product of policy rather than anecdotal. *See Grandstaff*, 767 F.2d at 171.

B.    Midland County's *Monell* Liability.

In its motion to dismiss, Midland County argued that it cannot be liable for the unconstitutional conduct of its contractor, Soluta, Inc. Midland County wrongly analogized to respondeat superior liability. This issue is one of delegation of policymaking authority, not respondeat superior liability. Midland County may not avoid its constitutional responsibility to provide medical care and safe housing by delegating its healthcare responsibilities to a private contractor. The issue is well summarized by the court in *Rodriguez v. S. Health Partners, Inc.*, No. 3:20-CV-0045-D, 2020 WL 7056336, at *13 (N.D. Tex. Dec. 2, 2020):

> As a preliminary matter, the court notes that Navarro County and SHP can both be held liable under § 1983 for the policies at issue. The Supreme Court has stated that "there will be cases in which policymaking responsibility is shared among more than one official or body." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). The Court has also explained that if "a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose." *Id.*; *see also King ex rel. Estate of King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("The County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services."); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Although [a private medical-care provider] has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the [provider]. In that sense, the county's duty is non-delegable."). Accordingly, if the court were to ultimately conclude that Navarro County *did* delegate policymaking authority to SHP, such a holding would not of itself preclude Navarro County from also being held liable under § 1983. In that sense, Rodriguez has adequately pleaded the second *Monell* element with regard to both SHP and Navarro County for the policies at issue.

*Rodriguez*, 2020 WL 7056336, at *13 (full cite added for *Praprotnik*); *see also West v. Atkins*, 487 U.S. 42, 56 (1988) (contracting out prison medical care does not relieve state of its constitutional duty to provide adequate medical treatment to those in its custody and does not deprive state's prisoners of means of vindication of their Eighth Amendment rights under § 1983).

Thus, notwithstanding that Midland County chose to delegate its policymaking authority to a private contractor to provide healthcare at its jail, Midland County remains responsible for those policies, the same as it would be responsible for any other unconstitutional policies implemented by anyone whom the County clothes with policymaking authority. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978). When a county delegates policymaking authority of non-delegable duties to others, it does so at its peril.

Additionally, there exists no absolute requirement that a plaintiff establish a "pattern" of conduct to plausibly allege that a governmental entity is on notice of a de facto unconstitutional policy. This issue was recently addressed by this Circuit in *Sanchez v. Young County*:

> Showing a pervasive pattern is a heavy burden. *See Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009). But here, no one disputes that the County sheriff is the relevant policymaker or that he knew about the Commission reports and about the details of Simpson's death. And Plaintiffs argue that even after her death, the sheriff neither punished any jailers involved nor took any action to correct the jail's alleged deficiencies. When the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction

arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy. *See Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 208-09 (5th Cir. 2011) (upholding jury finding that a county jail maintained an unconstitutional condition where there was evidence that the county policymaker knew of unconstitutional conditions yet failed to revise its policies); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city); *see also Piotrowski*, 237 F.3d at 578 n.18 (explaining that *Grandstaff* affirmed municipal liability because a policymaker's post-incident actions can ratify the prior misconduct). Plaintiffs' evidence therefore creates a fact issue about whether the sheriff acquiesced to the allegedly inadequate monitoring practices.

*Young Cty.*, 956 F.3d at 793 (full cited added for *Duvall*). Also, in *Grandstaff* this Circuit determined that similar action by multiple officers in a single incident was indicative of a policy, without the need for the plaintiff to establish a pattern. *Grandstaff*, 767 F.2d at 171.

As in *Young County* and *Grandstaff*, Plaintiffs pleads the existence of de facto unconstitutional policies of which the relevant policymakers were on notice. Soluta's "go-to-guy," Nurse Forbush, admitted that it was common practice to making entries on the SVN Treatment Flo-Sheet long after the treatment occurred. (ROA.43 [¶¶ 48, 50]). It is a reasonable inference that if actual readings were being recorded, they would be recorded at the time of treatment, and not at some future time. The failure to log readings at the time of treatment is a situation ripe for abuse. Furthermore, the criminal investigation by the Texas Rangers determined that video

evidence shows that none of the six nurses responsible for administering treatments even once used the medical instruments necessary to take the readings they purported to log on the SVN Treatment Flo-Sheet. No one questioned these failures, and no one declined to participate in the truncated procedure. The Rangers reached the only reasonable conclusion: all the nurse entries on the SVN Treatment Flo-Sheet were falsified. A record was created merely for purposes of appearance, not to administer the medical care that Hall required. One can only wonder that if the nurses were willing to forgo even the simple effort of placing an O2 meter on a finger, if they also failed to properly fill the nebulizer with the medicine Hall needed. Regardless, the falsification of a governmental medical record had the obvious foreseeable result that a detainee would die as the result of false information indicating that he was responding treatment, when in fact he was not. (ROA.42 [¶ 46])

When so many employees act in the exact same manner under the same conditions, this is evidence of an ongoing custom that constitutes a de facto policy; i.e., it is "accepted as the way things are done and have been done in" the Midland County jail. *See Grandstaff*, 767 F.2d at 171. Although it is common defense strategy to downplay *Grandstaff* as some sort of second-class precedent, this Circuit has continued to cite *Grandstaff* authoritatively in recent decisions. *See Moore v. LaSalle*

*Mgmt. Co., L.L.C.*, 41 F.4th 493, 510 n.56 (5th Cir. 2022); *Young Cty., Tex.*, 956 F.3d at 793.

Furthermore, the constitutional violation here is similarly egregious to that in *Grandstaff*. In *Grandstaff* six professional employees (police officers) participated in the misconduct (four of which were sued in *Grandstaff*). *Grandstaff*, 767 F.2d at 165. In the present case six professional employees (nurses) all participated in the constitutional misconduct – misconduct that led to Hall's death. The decedent in the present case is no less dead than Mr. Grandstaff merely because the misconduct in this case concerns deliberate indifference to a detainee's serious medical needs rather than the wrongful use of deadly force. Moreover, for Hall it was an agonizing death, as he struggled for air and his pleas for help to a seventh employee (Stickel) were ignored. *Grandstaff* cannot be distinguished based upon egregious facts.

The district court failed to acknowledge Midland County's nondelegable duties to provide medical care and safe incarceration for those it chooses to detain. Instead, the district court incorrectly analyzed the issue of Soluta's conduct as one of *respondeat superior*, and erroneously concluded that Midland County bears no responsibility for the misconduct of Soluta and its employees. The heart of the district court's error, which infects the totality of its analysis, is succinctly summarized in a passage page 19 of the opinion addressing Soluta's understaffing:

> [A]ny alleged . . . policy was not attributable to Midland County since Soluta "as opposed to Midland County . . . took the lead" in developing

healthcare related policies. (*Id.* ¶ 115). Midland County can only be held for conduct "directly attributable" to it. *Piotrowski*, 237 F.3d at 578. It cannot be liable by *respondeat superior* for the policies of Soluta or the actions of Soluta's employees. Plaintiffs fail to show how understaffing, or any other policy promulgated by Soluta, is directly attributable to Midland County.

(ROA.649) The court's analysis badly misses the mark. It is because Midland County abdicated its policymaking responsibilities to Soluta that it is responsible for Soluta's policies. Midland County does not avoid its nondelegable duties by purporting to assign them to a private contractor. The district court allows the county to avoid its constitutional responsibilities by simply signing a contract with a private company, then turning its back and ignoring what occurs. But this is precisely what it may not do. Midland County may not assign the responsibility for medical care of its detainees to a private contractor and then wash its hands of its constitutional obligations to ensure that the serious medical needs of its detainees are met. All of Soluta's policies *are* county policies for the provision of medical services in the county jail. Consequently, each of Soluta's policies is directly attributable to Midland County.

The *Piotrowski* case on which the district court relies does not address a county's responsibility for the policies of a private contractor to which it delegates governmental policymaking. *See Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Rather, in the cited passage *Piotrowski* merely makes the well-established point that the Supreme Court in *Monell* rejected the notion that local

governments bear respondeat superior liability for the misconduct of their employees. Plaintiffs have no quarrel with *Monell*, and Plaintiffs' theory of liability in no manner rests on the notion that Midland County has *respondeat superior* liability for the misconduct of its employees, or those of Soluta. Rather, Plaintiffs allege that Midland County is liable for the policies of Soluta that are a moving force in Soluta's employees committing constitutional violations which injure Midland County's detainees.

Because Soluta's policies are those of Midland County, Plaintiffs' only responsibility was to plead sufficient facts to demonstrate the existence of the policies that were a moving force in causing the alleged harm. Plaintiffs did so by alleging the *Grandstaff* and *Young County* liability theories discussed *supra*. Plaintiffs allege that multiple Soluta employees all engaged in the same misconduct of falsifying breathing treatment records over an extended period of time, with no one dissenting from or questioning the conduct, thus demonstrating that the employees were acting pursuant to policy. The district court dismisses these allegations because it erroneously determined that Midland County cannot be responsible for its contractor's policies.

The district court contradicts itself in stating that "Plaintiffs' complaint fails to show that Midland County delegated policymaking authority." (ROA.652 [Op. at 22]) At page 19 the court acknowledges the opposite, noting that Plaintiffs allege

that "Soluta 'as opposed to Midland County . . . took the lead' in developing healthcare related polices." (ROA.649 [citing Plaintiffs' Complaint at ¶115]); s*ee also* ROA.19 [¶4 (alleging it was "Soluta, to which Midland County entrusted or delegated healthcare for and/or other duties regarding Midland County inmates . . . ")]; ROA63-64 [¶88 (alleging "the provision of medical services to Savion and others in the Midland County jail was clearly a joint effort by and between Midland County and Soluta. In the alternative or in addition, Midland County delegated to Soluta the provision of certain medical care services to Midland County prisoners.)]]) The balance of the district court's analysis similarly disregards Plaintiffs' allegations concerning the misconduct of Soluta's employees based on the flawed analysis that the County is not responsible for its contractor's policies.

Although Plaintiffs' *Monell* claim is based primarily on the misconduct committed by Soluta employees pursuant to county policy, Plaintiffs additionally allege that other county policies, including those which allowed Stickel to act as he did (or fail to act), interacted with Soluta's policies as a moving force in injuring Hall. In particular, putting an untrained jailer with a temporary license in charge of making life and death decisions was a reckless policy which reflects deliberate indifference to the lives of detainees. That fully-licensed jailers would react differently than Stickel can reasonably be inferred from the fact that Officer Clark immediately overruled Stickel upon coming on duty and required that Stickel obtain

medical treatment for Hall. Likewise, the County exhibited deliberate indifference in clothing a temporary jailer with unlimited discretion to decide when to declare a medical emergency, such that the jailer could choose not to declare an emergency until a critically ill detainee stopped breathing or fell unconscious. Together these policies prevented the jail's doctors, such as Willingham, from knowing the true condition of their patients and providing effective treatment for them. The district court erred in failing to consider how these policies interacted with Soluta's policy of allowing nurses to record observations after the fact and to simply make up readings rather than use the proper medical equipment to obtain them.

Finally, the County similarly evidenced its deliberate indifference toward Hall by discharging Hall from custody after he was transported to the hospital in critically ill condition. A jury could determine that the County acted to hide its complicity because its policymakers knew that county policy was a moving force in Hall's injury and suffering. *Cf. Harris v. Clay Cnty., Mississippi*, 47 F.4th 271, 278 (5th Cir. 2022) (lies and "other holes in the [defendant's] story" would allow a jury to conclude that the defendant knew its conduct was unlawful) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (discussing "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt' " (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).

The district court dismissed this allegation as speculation, but it is not. Nothing else explains why Hall was abruptly released from custody the second time Hall was hospitalized but not the first, and the district court fails to offer any other explanation. This is in fact an all too common occurrence. County jails allow the medical needs of detainees to go unmet or allow jailers to inflict unnecessary force, then when supervisors discover that a detainee has become critically ill or injured as a result, counties abruptly discharge the detainee in an attempt to avoid liability, conceal the facts, and avoid payment of medical expenses. To the knowledge of Plaintiffs' counsel, this Circuit has not addressed this odious practice. It should do so here and condemn it.

Because Plaintiffs pleaded a plausible *Monell* claim against Midland County, the district court erred in dismissing it.

ISSUE 2:  The district court erred in dismissing Plaintiffs' claim against Jailer Daniel T. Stickel because Plaintiff pleaded a plausible claim which defeats qualified immunity. Checking a critically ill detainee only to determine if he is still breathing, and refusing to declare a medical emergency unless the critically ill detainee becomes "unresponsive" or has "lost consciousness," is deliberately indifferent to the detainee's constitutional right to treatment for serious medical needs.

A.    Introduction and standard of review.

1.    Pleading Standards.

The same pleading standards apply as set forth in Issue 1, Section A.1. The standard of review is de novo. *Doe*, 528 F.3d at 418.

2.    Serious medical needs and protection from harm.

"The constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). These rights include the right to medical care and protection from harm. *Converse v. City of Kemah, Tex.*, 961 F.3d 771, 775 (5th Cir. 2020); *Sanchez*, 866 F.3d at 279. Although other Circuits disagree, this Circuit continues to apply the *pre-Kingsley*[3] subjective deliberate indifference standard to pre-trial detainee claims other than those for excessive force. *Cope v. Cogdill*, 3 F.4th 198, 207 n. 7 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2573 (2022).

To succeed on a deliberate-indifference claim in this circuit, Plaintiffs must show that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference. *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001); *Hare*, 74 F.3d at 643. Although deliberate indifference is a rigorous standard, it is not an impossible standard, and defendants do not escape liability by simply denying that they possessed the requisite subjective knowledge. Rather, deliberate indifference may be established through inferences arising from circumstantial evidence the same as any other claim, and a factfinder may infer the

---

[3] *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

requisite knowledge from the fact that the risk of harm was obvious. *See Farmer v. Brennan*, 511 U.S. 825, 837, 842 (1994); *Dyer*, 964 F.3d at 385; *see also Converse*, 961 F.3d at 780 n.7.

It has been clearly established law for at least 20 years that a custodial officer acts with deliberate indifference to a detainee's serious medical needs if the officer refuses treatment, ignores the detainee's complaints, intentionally treats him incorrectly, or engages in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Sims v. Griffin*, 35 F.4th 945, 951 (5th Cir. 2022) (citing *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (per curiam) (quoting *Domino*, 239 F.3d at 756)).

A delay in medical care violates the Constitution " 'if there has been deliberate indifference [that] results in substantial harm.' " *Easter*, 467 F.3d at 464 (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993)). The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay. *Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994). Evaluating a delay in providing medical attention for life-threatening injuries "is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes." *See Valderrama v. Rousseau*, 780 F.3d 1108, 1120 (11th Cir. 2015). "[W]hen officers intentionally delay seeking treatment for a life-threatening injury, they act with deliberate indifference." *Valderrama*, 780 F.3d at 1121. If a state

official intentionally delays a pretrial detainee's access to medical treatment and the official knows that the detainee has a life-threatening or urgent medical condition that would be exacerbated by delay, this also establishes deliberate indifference. *Tamez v. Manthey*, No. CV B-07-213, 2008 WL 11451445, at *8 (S.D. Tex. Sept. 18, 2008) (citing *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997); *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1186-87 (11th Cir. 1994) ("knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference")). Consequently, failing to promptly obtain emergency assistance when a detainee faces a known, serious medical emergency constitutes unconstitutional conduct. *Cope*, 3 F.4th at 209.

A jury can infer deliberate indifference when an officer fails to justify or explain a delay in medical treatment. *Wade v. Daniels*, 36 F.4th 1318, 1327-28 (11th Cir. 2022). The detainee need not be permanently impaired or die before an actionable claim arises for delayed emergency treatment. Rather, a plaintiff may recover for pain suffered during a delay in treatment caused by deliberate indifference. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422–23 (5th Cir. 2017).

3.      Qualified Immunity.

The doctrine of qualified immunity protects a government official from civil liability for damages that occurred because of the official's performance of

discretionary functions, if the official's acts were objectively reasonable in light of the clearly established law at the time of the action. *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 456 (5th Cir. 2001). The court conducts a two-part inquiry: (1) whether a constitutional right would have been violated on the facts alleged; and (2) whether the constitutional right was "clearly established." *McClendon v. City of Columbia*, 305 F.3d 314, 322-23 (5th Cir. 2002). "Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). An official's acts are objectively reasonable "unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson*, 245 F.3d at 457 (emphasis in original).

The United States Supreme Court has repeatedly reminded that not only should courts refrain from defining clearly established law at too high of generality, but likewise clearly established law should not be defined with unnecessary granularity when a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question. *See Taylor v. Riojas*, 141 S.Ct. 52, 53-54 (2020) (per curiam) (citing *Hope v. Pelzer*, 536 U. S. 730, 741 (2002) (explaining that " 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question' "

(quoting *United States v. Lanier*, 520 U. S. 259, 271 (1997)))); 536 U. S., at 745 (holding that "[t]he obvious cruelty inherent" in putting inmates in certain wantonly "degrading and dangerous" situations provides officers "with some notice that their alleged conduct violate[s]" the Eighth Amendment); *see also Tyson v. Sabine*, 42 F.4th 508 (5th Cir. 2022) (holding that "[i]t is obvious that the right to bodily integrity forbids a law enforcement officer from sexually abusing a person by coercing them to perform nonconsensual physical sex acts for his enjoyment."). Nor does the "obvious clarity" standard apply only to extreme circumstances of the type discussed in *Taylor*. Extreme and egregious circumstances exist anytime a state officer, sworn to defend the Constitution, harms individuals through conduct which obviously violates the Constitution. *See, e.g., McCoy v. Alamu*, 950 F.3d 226, 231 n.3, 234 (5th Cir. 2020), *cert. granted, judgment vacated*, 141 S.Ct. 1364 (2021) (minor injuries caused by excessive force from single use of pepper spray without provocation; circuit court's rejection of "obviousness" exception reversed and remanded in light of *Taylor*).

4.    Preservation of error in the event of en banc or Supreme Court review: *An objective standard should apply to all pretrial detainee claims*.

This Circuit should join the well-reasoned opinions of the Second, Sixth, Seventh, and Ninth Circuits that *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), requires adopting an objective liability test for pretrial detainee claims. *See Darnell*

*v. Pineiro*, 849 F.3d 17, 34-35 (2nd Cir. 2017) (conditions of confinement generally);

*Bruno v. City of Schenectady*, 727 F. Appx 717, 720 (2nd Cir. 2018) (medical-need

claim); *Westmoreland v. Butler Cnty.*, 29 F.4th 721, 727-29 (6th Cir. 2022); *Brawner*

*v. Scott Cty., Tennessee*, 14 F.4th 585, 592-97 (6th Cir. 2021); *Miranda v. Cty. of*

*Lake*, 900 F.3d 335, 350-52 (7th Cir. 2018) (medical-need claim); *Castro v. Cty. of*

*Los Angeles*, 833 F3d 1060, 1069-70 (9th Cir. 2016) (en banc), *cert denied* 137 S. Ct.

831 (2017) (failure-to-protect claim). Only the Tenth Circuit remains an outlier

among circuits that have analyzed the opposing view of other circuits. *See Strain v.*

*Regalado*, 977 F.3d 984, 990-93 & n.6 (10th Cir. 2020), *cert. denied*, 142 S. Ct. 312

(2021). The Sixth Circuit recently examined the Tenth Circuit's *Strain* decision and

found it unpersuasive, and therefore joined the Second, Seventh, and Ninth Circuits

in applying *Kingsley* to claims brought by pretrial detainees. *Brawner*, 14 F.4th at

592-97.

    The Eighth and Eleventh Circuits, like this Circuit, have addressed only in

brief footnotes whether pre-*Kingsley* precedent continues to apply, without seriously

examining the contrary view of other circuits. *See Cope*, 3 F.4th at 208 n.7; *Whitney*

*v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Bryant v. Buck*, 793 F.

Appx 979, 983 n.3 (11th Cir. 2019). This Circuit should fully examine the contrary

view of other circuits. As recently stated by the Sixth Circuit, "a subjective

requirement 'cannot be reconciled with *Kingsley's* language, reasoning, and

reminder to 'pay careful attention to the different status of pretrial detainees.' " *Westmoreland*, 29 F.4th at 729 (quoting *Kemp v. Fulton Cnty.*, 27 F.4th 491 (7th Cir. 2022)). Although Appellants maintain that the allegations in Plaintiffs' complaint are clearly sufficient to demonstrate deliberate indifference, this Circuit should reconsider whether *Kingsley* requires an objective test for all pretrial detainee claims.

Although the Circuit's rule of orderliness usually prevents one panel from reconsidering a prior panel's decision, this Court recently recognized an exception in *Carswell v. Camp*, 37 F.4th 1062, 1067 (5th Cir. 2022). The exception applies when prior decisions fail to properly apply Supreme Court precedent. In *Carswell*, a single panel sweepingly overruled a number of prior decisions because it determined they were inconsistent with Supreme Court precedent from 2007 and 2009 (i.e., *Iqbal/Twombly*). If *Carswell's* application of the rule of orderliness is correct,[4] *en banc* consideration is unnecessary and this panel can review whether *Cope* failed to faithfully apply *Kingsley*[5] on the issue of whether an objective test should replace the deliberate indifference standard for failure-to-protect claims. Alternatively, Appellants preserve this issue for further review should this case be considered *en banc*, or if there is otherwise a change in law during this appeal.

---

[4] In *Carswell* Plaintiffs' counsel has filed a petition for rehearing arguing that the *Carswell* panel failed to properly adhere to the rule of orderliness. No decision on the petition has been issued as of this filing.

[5] *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

B.    Defendant Stickel's constitutional violation.

Stickel made a conscious decision not to respond to a medical emergency until a detainee lost consciousness or stopped breathing. He never discussed Hall's alarming condition with *anyone,* much less medical personnel, until the end of his shift. He ignored the alarming conditions he observed: Hall's labored breathing; Hall's inability to stand without support; and that Hall appeared close to passing out. Stickel further ignored Hall's repeated complaints that without medical attention he "was not gonna make it:" i.e., he would die. What little Stickel *claims*[6] to have done (i.e., ask another jailer about the usual breathing treatment protocol; ask Hall if his inhaler was empty; call medical once with no answer; and periodically observe Hall to see if he was still breathing or unconscious) was absurdly insufficient to respond to the medical emergency Stickel witnessed and failed to respond to for nearly six and a half hours: i.e., from 12:30 a.m. when Hall first complained that he was not going to make it, until 6:55 a.m. when Hall was sent to medical at the direction of Officer Clark who had just come on duty to replace Stickel at the end of his shift. That this was an emergency medical condition is confirmed by the fact that the oncoming jailer immediately intervened and instructed Stickel to contact medical for

---

[6] Plaintiffs neither allege nor contend that Stickel's self-serving statements, all prepared after the fact, are in their entirety true, accurate, or complete, and it would be contrary to the standard of review to assume that they are. The more reasonable inference that Stickel prepared these statements after-the-fact in an attempt to downplay his deliberate indifference and to avoid liability. Courts should not automatically accept an officer's version of events. *See, e.g., Fairchild v. Coryell County, Texas*, 40 F.4th 359, 363 (5th Cir. 2022).

Hall; and Hall was thereafter rushed to the hospital for what proved to be the expected unsuccessful lifesaving treatment. Although Stickel's failure to obtain emergency medical treatment for Hall likely contributed to Hall's death, Plaintiffs need not plead or prove that it did so. It is sufficient to state a cause of action that Stickel's failure to act caused Hall additional pain and suffering. *Alderson*, 848 F.3d at 422–23. This is plainly evident from the pleaded facts.

First, Stickel acknowledges that when he observed Hall during the late evening and early morning hours of July 10 and 11, Hall was breathing "with difficulty," "he was having trouble maintaining his ability to stand," "he was close to passing out," and Hall twice stated that he "was not gonna make it." (ROA.57-58 [¶ 76]) Stickel further admits that "the situation gave me nerves." (ROA.58 [¶ 76]) Moreover, Stickel consciously considered whether to "call a 'medical emergency,'" but decided not to do so unless "Hall became unresponsive or lost consciousness." (ROA.58 [¶ 76]) Apparently anticipating that Hall could stop breathing at any time, Stickel claims to have checked on Hall multiple times to observe that he was still breathing. (ROA.56 [¶ 76])

By acknowledging that he knew Hall had difficulty breathing; that Hall was close to passing out and might stop breathing at any time; and that the situation gave Stickel "nerves," Stickel admitted he subjectively understood that Hall was seriously ill and needed emergency medical attention. Moreover, Hall's repeated complaints

that he was not going to make it, indicating that Hall felt so ill that he believed he would pass out and die, reinforced what Stickel already knew. Stickel's decision to delay calling a medical emergency until Hall actually lost consciousness was absurd. This is a decision that would only be made by the plainly incompetent or one knowingly violating the law. Stickel's conduct is like failing to stop the bleeding of a wound victim until he loses consciousness, or ignoring the chest pains of a coming heart attack until the victim collapses in full cardiac arrest. Stickel consciously determined that he would allow Hall to suffer, both physically and mentally, until his condition worsened to the point that it became so critical that Hall lost consciousness. This served no legitimate penal purpose. Rather, it was deliberately indifferent to Hall's serious medical needs, and an objectively unreasonable response in light of clearly established law. No reasonable official could have believed it is constitutional to deny medical care to a pretrial detainee known to require emergency medical care. *See, e.g., Tamez*, 2008 WL 11451445, at \*8; *Lancaster*, 116 F.3d at 1425; *Hill*, 40 F.3d at 1186-87; *see also Easter v. Powell*, 467 F.3d 459, 463-64 (5th Cir. 2006). Thus, Plaintiffs have stated a plausible claim against Stickel for denial of medical care, failure to provide protection, and infliction of punishment, which defeat Stickel's assertion of qualified immunity.

Stickel's attempt to attribute his decision to medical advice is both contrary to the pleadings and fails to address Stickel's actual conduct. First, in his statements,

Stickel acknowledges that he never spoke with any medical professional concerning Hall's condition before Officer Clark intervened at the end of Stickel's shift. (ROA.5-58 [¶ 76]) Rather, Stickel claims to have believed that Hall was not eligible for an additional breathing treatment for 4 to 5 hours "due to prior knowledge from working within the special housing unit." (ROA.56 [¶ 76]) Stickel claims to have called another guard who allegedly confirmed that this was the medical unit's "protocol." (ROA.56 [¶ 76]) Even if that was the ordinary protocol for breathing treatments, this did not address the acutely ill situation that Stickel confronted. Stickel does not claim to have relayed Hall's current critical condition to either the other guard or any medical personnel. That the protocol did not apply to this situation is evident from the fact that Hall eventually was taken to medical personnel at the direction of another officer an hour and a half before Stickel claims to have believed Hall was "eligible," and then quickly transferred by Dr. Willingham to a hospital for emergency treatment. Although it was apparent to Stickel that Hall was critically ill and his condition worsening, Stickel did not bother to consult with any medical personnel regarding Hall's current condition.

Furthermore, without question *no medical personnel told Stickel to wait until Hall lost consciousness before declaring a medical emergency*. This was solely Stickel's decision, made without consulting anyone. The likely reason that Stickel did not bother to consult with anyone is that he was acting in accordance with

Midland County policy which customarily allowed such discretion to its jail guards, who allowed detainees to become critically ill before seeking treatment. (*See* ROA.66 [¶ 94]) Stickel's claim to have relied upon the ordinary protocol used for routine breathing treatments when confronted with an obvious medical emergency is disingenuous, and it raises issues of Stickel's credibility as to whether Stickel actually believed what he later claimed in his *post-hoc* reports. Stickel's after-the-fact rationalizations do not in the least absolve Stickel of his deliberate indifference to Hall's serious medical needs, and his decision to delay seeking medical advice and treatment.

Rule of Evidence 407, Subsequent Remedial Measures, has no applicability to Stickel's reports. The reports do not concern remedial measures. To the contrary, each report on its face purports to be a late report of information which Stickel concedes should have been prepared at the time of the events. (ROA.55-58 [¶ 76]) To the extent that Stickel acknowledges that his performance was deficient, he is merely acknowledging the obvious, and his statements are admissions which may properly be used against him.

Nor is Stickel insulated from liability because he claims to have taken some meager measures to assist Hall by checking him periodically to see if he was still breathing and asking him if his inhaler was empty. This Circuit has repeatedly held that taking meager measures that are unlikely to be sufficient to protect detainees

will not pass constitutional muster. *See Converse*, 961 F.3d at 779. "[T]aking some reasonable precautions does not mean the officer, on the whole, behaved reasonably." *Id.* at 779 (citing *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 395-96 (5th Cir. 2000)). As in *Converse* and *Jacobs*, Stickel's ineffective response was insufficient to "mitigate his errors." *Converse*, 961 F.3d at 779 (citing *Jacobs*, 228 F.3d at 395).

In concluding that Plaintiffs failed to allege a constitutional violation by Stickel, the district court incorrectly characterized Plaintiff's pleaded facts; it embellished the facts with allegations nowhere found in the pleadings; and it repeatedly indulged inferences in favor of the defendant in violation of the standard of review. *See Fairchild*, 40 F.4th at 363-64 (district court erred in failing to view evidence in light most favorable to the plaintiff). The result was to unduly minimize Stickel's egregious conduct, which the court described as an inconsequential 40-minute delay in treatment, and to wrongly attribute Stickel's failure to act to reliance upon medical advice. The court's version of events grossly mischaracterizes the pleaded facts and relies heavily upon the SVN Treatment Flo-Sheet which Plaintiffs alleged is filled with false and fabricated information.

First, the district court misleadingly states that Hall saw medical three times during Stickel's eight hour shift, and then spins Hall's alleged treatment as both "successful" and Stickel's initiative. this as (*E.g.*, ROA. 650 [Op. at 20 (Stickel

"ensured that Hall was seen by medical . . . ."]) This is based on the assumptions that Hall was seen by medical at beginning and end of Stickel's shift, and also at 4:00 a.m. as referenced in the Flo-Sheet, i.e., the Flo-Sheet that Plaintiffs pleaded was fraudulently prepared and is inaccurate. It further assumes that Stickel was responsible for Hall receiving the alleged treatments. But this is not what occurred, even according to Stickel's statements.

First, to what extent Hall interacted with *any* medical personnel and actually received *any* medication during Stickel's shift is unknown to Plaintiffs. As noted by Ranger Gray, many times Hall attempted to self-administer breathing treatments without any assistance from Soluta medical personnel. (ROA.59 [Item 2.4]) To what extent Hall was able to correctly perform the procedure himself and actually obtain therapeutic treatment is unknown. The more favorable inference to Plaintiffs is that even if Hall was allowed to go to the medical area three times between 10:50 p.m. and 7:00 a.m., Hall never interacted with medical personnel during Stickel's over-night shift and never received any effective doses of medication. Regardless, what is known and is pleaded is that Stickel observed Hall experiencing a critical medical crisis over the course of six and a half hours and in response made the conscious decision not to request emergency assistance for Hall unless Hall lost consciousness or stopped breathing.

Additionally, even if Hall visited medical during Stickel's shift, it was not at Stickel's initiative. With respect to the first alleged trip to medical, Stickel merely notes that when he came on duty Hall was not in his cell. (ROA.55 [¶ 76]) Stickel failed to record any reason for this at the time, but in his "Inmate Injury" report belatedly attributed the absence to "common knowledge" that Hall obtained breathing treatments at night. (ROA.55 [¶ 76]) Even if this is accurate, Plaintiffs allege that the breathing treatments were not providing Hall with the relief he needed; that Hall's condition was deteriorating and did deteriorate to a medical emergency during Stickel's shift; that Hall's critical condition was obvious; that Stickel recognized it as a medical emergency; that Hall complained he was going to die; and that Stickel consciously determined not to obtain medical treatment for Hall.

As to the trip to medical that occurred at the end of Stickel's shift, this was solely because Officer Clark intervened and directed Stickel to contact medical. Had it not been for the intervention of Officer Clark at the end of Stickel's shift, Stickel would not have done so because Hall had not yet lost consciousness.

The alleged 4:00 a.m. treatment is even more problematic. Plaintiffs do not allege that Hall saw medical or received any treatment at 4:00 a.m., or that any treatment was successful. The district court apparently infers this from the Flo-Sheet which purports to note a treatment occurring at 4:10 a.m. (ROA.30) The district court further states that Hall "successfully received treatment" at this time, presumably

based on the oxygen levels allegedly recorded as 98% and the comment "improved." (ROA.30) But of course it is precisely this information that Plaintiffs allege was untrue, fraudulently prepared, and could not possibly be based on fact because Soluta nurses never used the instruments necessary to obtain any such readings. For the district court to assume that any information included in the Flo-Sheet by Soluta nurses is accurate, including that the alleged 4:00 a.m. visit occurred or that it was "successful," violates the standard of review by indulging inferences adverse to Plaintiffs. *See Fairchild*, 40 F.4th at 363-64.

Perhaps even more egregiously, the district court repeatedly attributes direct communication between Stickel and Soluta's nurses, and states that Stickel was informed that Hall could not be treated earlier than 4 to 5 hours after the prior treatment. (E.g., ROA.643 [Op. at 13]) Again, this is not what Plaintiffs allege. In his statements, the only communication Stickel claims to have had with medical was indirectly through another jailer, and this concerned only the usual treatment schedule, i.e., the protocol" for breathing treatments. (ROA.56) This alleged indirect communication did not address the crisis condition that Hall was experiencing and that Stickel observed. Thus, in his statement, Stickel claims to have known that medical would not ordinarily allow an inmate to return to medical without 4-5 hours of his last treatment. (ROA.56) Stickel then claims to have called Officer Jimenez, who was manning the special housing guard station, to verify what Stickel claims to

have remembered. (ROA.56) Stickel then claims that Jimenez "offered me the same information" and Jimenez allegedly confirmed this "protocol" with the on-duty nurse (who Stickel could not identify). (ROA.56) Critically, however, nowhere in his statements does Stickel claim that he informed Jimenez of Hall's dire condition or that Stickel otherwise relayed Hall's current condition to medical. Clearly, the "protocol" Stickel referenced is for a patient who is not experiencing a medical crisis. This is obvious from the fact that medical did see Hall once Officer Clark intervened at the end of Stickel's shift, even though Stickel continued to claim he believed Hall could not see medical at that time. Stickel's failure to convey Hall's current condition to medical, or anyone else, is like calling a doctor's officer to confirm when a prescription can be re-filled, *but failing to inform them that the medication is not working and the patient is about to lose consciousness and die*. Stickel's dogmatic insistence that an obviously dying man fighting to breathe could not be seen by medical personnel until after the expiration of an arbitrary 4 to 5 hour period is so unreasonable and so unlikely that a jury could, and likely would, disbelieve Stickel and conclude he fabricated the after-the-fact explanation he included in his reports for failing to act. Ultimately Stickel's self-proclaimed state-of-mind is a fact issue for a jury, and not an issue that can be resolved by the court on the pleadings. Stickel never communicated directly with medical about Hall's condition as Stickel observed it; Stickel never obtained any medical advice regarding

Hall's current condition; and Stickel was never advised by medical that Hall, in his current condition, could not be seen by medical. The district court's conclusion that Stickel was relying on medical advice is not supported by the pleadings.

Thus, the district court's reasoning is erroneous when it states, "If medical did not recognize a medical emergency, Stickel could not have been expected to recognize any medical emergency when Hall received three breathing treatments." (ROA.643 [Op. at 13]) Medical did not recognize a medical emergency because Stickel never reported the emergency conditions to medical. Further, at the time Hall was complaining that he was going to die without treatment, Hall had certainly not received "three breathing treatments" since the alleged third treatment did not occur until after Officer Clark intervened. If in fact Hall had received any breathing treatments before complaining to Stickel that he was going to die, it would have been apparent to Stickel that prior treatments were insufficient to address Hall's current crisis condition in which Hall had difficulty breathing to the point he could not stand on his own, appeared about to pass out, and complained he was not going to make it without treatment. Thus it is incorrect, contrary to the district court's opinion that "Stickel was aware that Hall had been seen, examined, and diagnosed by medical and had access to his medications." (ROA.64 [Op. at 14]) Hall's emergency medical condition, with an oxygen reading of only 87 and alarmingly low blood pressure, was unknown, unexamined, and undiagnosed because Stickel never relayed Hall's

deteriorated condition and complaints to medical. And because Stickel observed Hall's deteriorating condition, Stickel knew that merely because Hall may have had an inhaler and prior medical treatment, this was ineffective to address the medical crisis Hall was then experiencing. As soon as Dr. Willingham was able to diagnose Hall's emergency condition, he had Hall transported to the hospital for emergency treatment. But by that time it was too late. Exactly as Hall had told Stickel, he didn't make it.

Nor is it correct, contrary to the opinion below, that Hall's symptoms were similar throughout his incarceration. Not even Stickel claims this. Stickel does not claim to have previously witnessed Hall being unable to stand on his own, or appear as if he was going to pass out, or hear Hall complain that he was not going to make it. Nor does Stickel claim to have previously considered declaring a medical emergency for Hall, but determining not to do so until Hall lost consciousness or stopped breathing. Likewise, Stickel does not claim that Hall's situation had previously given him "nerves." Stickel's reports clearly support the inference that Stickel recognized the medical emergency, but was deliberately indifferent to by choosing not to report it and making a conscious decision that he would not act until Hall lost consciousness or stopped breathing.

Finally, the district court's causation conclusions are also dependent on adverse inferences that violate the standard of review. The district court concludes,

contrary to Plaintiffs' allegations, that "Hall did not succumb to his condition during either of [Stickel's] . . . alleged 'delays' " because "Hall spent another week in the hospital before passing." (ROA.645 [Op. at 15]) The more reasonable inference, which appropriately favors Plaintiffs, is the opposite. Upon examination by Dr. Willingham (after Officer Clark intervened), Willingham discovered that Hall's blood pressure was dangerously low and his oxygen level had fallen to a critical level of only 87, and could not be substantially improved with a breathing treatment. Hall was immediately rushed to the hospital and never recovered. From this it is a reasonable inference that the six-and-a-half hours Stickel delayed in calling a medical emergency while waiting for Hall to lose consciousness as Hall fought for air substantially contributed to Hall's eventual demise. As other courts have noted, mere minutes are important in an emergency. See *Valderrama*, 780 F.3d at 1120 This is why it is so important that a detainee not be held in a prone position for any longer than necessary. *See Fairchild*, 40 F.4th at 368 (holding detainee in a prone position for over two minutes after being subdued violated clearly established law); *Timpa v. Dillard*, 20 F.4th 1020, 1030-40 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2755 (2022). Here, Hall's breathing was compromised for hours before he received emergency treatment.

It clearly is an impermissible adverse inference for the district court to assume that merely because Hall lingered for a week in the hospital before expiring that the

delay in providing emergency medical care did not contribute to his death. Even detainees who attempt suicide by strangulation may survive longer than a week before expiring. Ultimately, the impact of the delay is a fact issue that should be resolved by a jury and not by the court on the pleadings.

Nonetheless, it is not Plaintiffs' burden to show that Hall died as a result of Stickel's inaction. It is sufficient that Hall experienced pain and suffering from a delay in treatment caused by Stickel's deliberate indifference. *Alderson*, 848 F.3d at 422. One can only imagine the suffering Hall experienced hour after hour as he fought for air. This was clearly exacerbated by the emotional distress Hall must have experienced as he realized he was dying, yet try as he might, could not obtain help as his pleas for assistance fell on deaf ears. This is substantial harm.

This district court plainly erred in concluding that Plaintiffs failed to state a constitutional violation against Stickel in his individual capacity[7] for his deliberate indifference to Hall's serious medical needs.

C.     Defendant Stickel violated clearly established law.

---

[7] Although the district court purported to also address "official capacity claims" at pages 16-17 of its opinion, Plaintiffs specifically sued Stickel in his individual capacity and did not assert an official capacity claim against Stickel. (ROA.25 [¶ 12: "Mr. Stickel is being sued in his individual capacity . . . ."]).

A right is clearly established only once it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Roque v. Harvel*, 993 F.3d 325, 331 (5th Cir. 2021). This does not require a case with identical facts, but only one with sufficiently similar circumstances to put the principle at issue beyond debate. As discussed recently in *Sims v. Griffin*, this Circuit's precedent in *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (per curiam) puts the issue of a defendant's unconstitutional beyond debate when a prison official refuses to treat a detainee, ignores his complaints, intentionally treats him incorrectly, or engages in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. *See Sims v. Griffin*, 35 F.4th 945, 951-52 (5th Cir. 2022) (relying on *Easter v. Powell* for clearly established law). As discussed in *Sims*, the defendant in *Easter v. Powell* violated this standard because she offered no treatment options to a patient with a history of cardiac problems who was experiencing severe chest pains. *Sims*, 35 F.4th at 951. Although *Sims* did not have identical facts, *Easter* nonetheless established the law with sufficient clarity to put the constitutionality of the defendants' conduct beyond debate. In *Sims*, officers knew that a detainee (Qualls) had swallowed a bag full of drugs, vomited multiple times, screamed for help, pleaded to go to the hospital, and had steadily deteriorated since his arrival at the jail. *Id*. at 952. Nonetheless, the officers sought no medical assistance for the detainee. *Id*. "In other words, a reasonable jury could find that the

officers each refused to treat Qualls, ignored his cries for help, and overall evinced a wanton disregard for Qualls's serious medical needs." *Id*.

Stickel committed similar misconduct here. He knew that Hall had a preexisting condition that compromised his breathing; he witnessed Hall's condition deteriorate; he ignored Hall's pleas for help; and he refused to declare a medical emergency to obtain medical assistance for Hall. *See also Delaughter v. Woodall*, 909 F.3d 130, 140 (5th Cir. 2018) (holding it is clearly established that delaying medical care can constitute a constitutional violation if the official knows substantial risk of serious harm exists, disregards that risk, and the delay results in substantial harm).

It is irrelevant that another officer eventually intervened and required Stickel to obtain treatment for Hall. The fact remains that Stickel observed a detainee in the midst of a medical crisis and refused to obtain medical treatment for him. Even if this lasted for "only" 40 minutes before another jailer intervened, this in nonetheless 40 minutes of pain and suffering that Hall should not have been required to endure before receiving emergency medical aid. *Cf. Timpa*, 20 F.4th at 1034, 1039 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2755 (2022) (holding that *any* continued use of force by holding detainee in prone position after detainee had been restrained nine minutes into altercation constituted excessive force; thus officer who failed to intervene for 34 seconds after detainee was subdued was subject to bystander liability). But

Plaintiffs actually pleaded a much longer period of delay. For nearly six and a half hours Stickel observed Hall's critical condition and unconscionably waited for Hall to pass out or stop breathing before Stickel was willing to declare an emergency. Such a prolonged failure to respond to the emergency is unquestionably prohibited by *Easter v. Powell.*

This case bears no resemblance to *Baldwin v. Dorsey*, 964 F.3d 320, 327-28 (5th Cir. 2020), relied on by the district court. (ROA.644) In *Baldwin* the arresting officer was alleged to have delayed three hours in providing an apparently intoxicated detainee with a suicide evaluation while the officer obtained needed test results to determine whether the detainee was intoxicated. In that instance the delay was the result of a legitimate governmental objective to ascertain the detainee's level of intoxication, and in the interim the officer "clearly kept [the detainee] from self-harm." *Id*. at 327-28. The detainee was subsequently released from custody without incident and her arrest record expunged. *Id*. at 324. In the present case the delay served only to cause a critically ill detainee to become even sicker to the point where his condition was unrecoverable.

Even were there no clear precedent, it is obvious that Stickel's conduct was unconstitutional. In this instance minutes mattered because Hall's breathing was compromised. Yet by his own admission, Stickel was willing to wait until Hall fell unconscious from lack of oxygen, or stopped breathing altogether, before

summoning assistance. The district court effectively endorses Stickel's barbaric methods, holding that it is perfectly constitutional for jailers to take no action to help a detainee in the midst of a medical crisis unless the detainee first falls unconscious or stops breathing. This Circuit should unambiguously reject any suggestion that prison officials comply with their constitutional duty to provide for the serious medical needs of their detainees by first requiring that prisoners literally fall to the floor unconscious before jailers must act.

Because Plaintiffs pleaded a plausible claim against Defendant Stickel that defeats qualified immunity, the district court erred in dismissing the claim.

## CONCLUSION

Appellants pray that the district court's rulings granting the motion to dismiss for each Defendant-Appellee be reversed and the case be remanded for further proceedings.

Respectfully submitted,

/s/ Bruce K. Thomas
Bruce K. Thomas
State Bar No. 19844300
Law Office of Bruce K. Thomas
12900 Preston Rd., Suite 590
Dallas, Texas  75230
Phone/Fax:  214/296-9650
bthomas@bthomaslaw.com

T. Dean Malone
Texas State Bar No. 24003265
dean@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904

**ATTORNEYS FOR PLAINTIFFS-APPELLANTS**

## CERTIFICATE OF SERVICE

I certify that on November 10, 2022, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon the following registered CM/ECF users:

**R. LAYNE ROUSE**
**lrouse@shaferfirm.com**
**MILES NELSON**
**mnelson@shaferfirm.com**
**SHAFER, DAVIS, O'LEARY &**
**STOKER**
**P.O. Drawer 1552**
**Odessa, TX 79760-1552**
*Counsel for Midland County*
*Defendants-Appellees*

/s/ Bruce K. Thomas
Bruce K. Thomas

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 12987 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5ᵗʰ CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 (Version 2205) in Times New Roman 14-point font, and 12-point font for footnotes.

/s/ Bruce K. Thomas
Bruce K. Thomas