**Case No. 22-50673**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

Angela Robinson, Individually; Clara Busby, as next friend, guardian, and parent of and for minors L.H. and T.H.; Rachel Ambler, as independent Administrator of, and on behalf of, Angela Robinson, minors L.H. and T.H., the Estate of Savion Vashon Hall, and Savion Vashon Hall's heirs at law,

Plaintiffs - Appellants

v.

Midland County, Texas; Daniel Stickel,

Defendants – Appellees

On Appeal from
United States District Court for the Western District of Texas
7:21-CV-111

**Reply Brief of Appellants**

Bruce K. Thomas
Law Office of Bruce K. Thomas
Texas State Bar No. 19844300
bthomas@bthomaslaw.com
12900 Preston Rd, Ste 590
Dallas, Texas 75230
Phone/Fax:  (214) 296-9650

T. Dean Malone
Law Offices of Dean Malone, P.C.
Texas State Bar No. 24003265
dean@deanmalone.com
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:      (214) 670-9904
ATTORNEYS FOR APPELLANTS

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................2

TABLE OF AUTHORITIES ....................................................................3

I.    Midland County remains liable for any constitutional deprivations caused by the policies, practices, or customs of its contractor. ...................................................4

II.    Appellees' alternative narrative is not supported by the Complaint and violates the standard of review. ...............................................................17

CONCLUSION .......................................................................................27

CERTIFICATE OF SERVICE ...............................................................28

CERTIFICATE OF COMPLIANCE.......................................................29

# TABLE OF AUTHORITIES

## Cases

*Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 422–23 (5th Cir. 2017) ..............................................................................................................24

*Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705-06 (11th Cir. 1985) ..........8

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989)................................................15

*City of Okla. City v. Tuttle*, 471 U.S. 808, 822, 105 S.Ct. 2427, 2435-36 (1985)...14

*Doe v. Dallas I.S.D.*, 153 F.3d 211, 217 (5th Cir. 1998) .........................................15

*Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ..................... 14, 15

*Hare v. City of Corinth*, 74 F.3d 633, 638–39 (5th Cir. 1996) (en banc)..................7

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)......................................12

*Johnson v. City of Shelby, Miss.*, 135 S.Ct. 346, 347 (2014)...................................16

*Kent v. Collin County, Texas*, 2022 WL 949963, at *6-11 (E.D. Tex. 2022) . passim

*King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ..............................................7

*Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1250 (6th Cir. 1989)........................8

*Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 510 n.56 (5th Cir. 2022) ........14

*Rodriguez v. S. Health Partners, Inc.*, No. 3:20-CV-0045-D, 2020 WL 7056336, at *13 (N.D. Tex. Dec. 2, 2020) ................................................................................8

*Sanchez v. Young Cty., Tex.*, 956 F.3d 785, 793 (5th Cir. 2020)..............................14

*Steel v. Alameda County Sheriff's Office*, 428 F.Supp.3d 235 (N.D. Cal. 2019 .......8

*United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) ..............................16

*West v. Atkins*, 487 U.S. 42, 56, 108 S.Ct. 2250 (1988)............................................7

*Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010)........................12

## Other Authorities

5 C. Wright & A. Miller, Federal Practice and Procedure, § 1219, at 277-278 (3d ed. 2002)....................................................................................................................16

TO THE HONORABLE COURT:

I.    Midland County remains liable for any constitutional deprivations caused by the policies, practices, or customs of its contractor.

Throughout the Complaint Plaintiffs make clear they allege that Midland County delegated its nondelegable duties to provide healthcare for detainees to a private contractor, Soluta, and that the County remains responsible for Soluta's policies and practices in performing the duties delegated to it. Specifically, Plaintiffs plead that "Midland County entrusted or delegated healthcare . . . for Midland County inmates" to Soluta, and is therefore "liable for [the] actions, inaction, policies, practices, and/or customs of Soluta." (ROA.19-20 [¶ 4]; *see also* ROA.80 [¶ 121 ("Midland County had non-delegable duties to provide care, protect, and not punish its inmates. Midland County could not insulate itself from liability by contracting with Soluta and allowing Soluta to do what Midland County was constitutionally obligated to do.")]) Plaintiffs further alleged, in the alternative, that the provision of medical services to Hall and other detainees was a joint effort by and between Midland County and Soluta, or "Midland County delegated to Soluta the provision of certain medical care services to Midland County prisoners." (ROA.63-64 [¶88])[1] Plaintiffs also alleged that the "[t]he County made decisions

---

[1] In the alternative or in addition, Plaintiffs alleged that "Midland County and Soluta acted and/or failed to act together, in a partnership and/or joint enterprise, or pursuant to similar legal principles, to provide or fail to provide care to inmates in Midland County's jail. Thus, Midland County is liable for Soluta's actions, inactions, policies, practices, and/or customs related to such purported care." (ROA.20 [¶ 4])

about policy and practice which it implemented through the County commissioner's court, sheriff, jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of the County as it related to its jail." (ROA. 62-63 [¶ 85]) Plaintiffs additionally alleged that "Midland County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers . . . .," ROA.19-20 [¶ 4]) Although not required to identify the chief policymaker in its pleading, Plaintiffs alleged that the Sheriff, jail administrator, and/or Commissioner's Court "was the relevant chief policymaker over matters at issue in this case" (ROA.80 [¶ 121])

Similarly, Plaintiffs alleged that "Soluta likewise made decisions about such policy and practice which it implemented through its final policymakers;" and that "Soluta's policy, practice, and/or custom is imputed to the County due to non-delegable duties owed by the County to jail inmates." (ROA. 63 [¶ 85]) Plaintiffs further stated that "Plaintiffs leave it to the court to determine the relevant chief policymaker for Soluta, and/or how that relevant chief policymaker must interact, if at all, with the relevant chief policymaker of Midland County in order to establish liability." (ROA.80 [¶ 121])

Midland County nonetheless argues that it is not liable for Soluta's policies, and, like the district court, mischaracterizes Plaintiffs' claim as based on a theory of respondeat superior liability. In essence Midland County argues that if a county

maintains plausible deniability as to the policies of its contractor, it can contract away its healthcare obligations and avoid all responsibility. But this is precisely what it may not do, because the County cannot avoid is nondelegable duty to provide healthcare and protection to detainees by assigning the responsibility to others, and then turn a blind eye to the contractor's practices in providing healthcare on behalf of the county. When a county abdicates its responsibility to others, it continues to remain responsible for its contractor's policies and practices.

Courts which have addressed this issue have repeatedly recognized the distinction between a claim based on a county's attempt to delegate its non-delegable duties and that of respondeat superior liability. This issue was recently addressed in the context of a motion to dismiss by the district court in *Kent v. Collin County, Texas*, 2022 WL 949963, at *6-11 (E.D. Tex. 2022). In that case, Collin County maintained that the plaintiff failed to state a *Monell* violation because only the employees of its private contractor (Wellpath), which the County engaged to provide medical care to detainees, committed the underlying constitutional violations alleged by the plaintiff. *Id*. at *6. The district court surveyed the law on whether a county is liable for the unconstitutional policies and practices of a private contractor to whom the county delegates its non-delegable duty and concluded that the plaintiff properly stated a cause of action against Collin County for its contractor's unconstitutional conduct. *Id*. at *6-11.

The court first noted that Collin County has a duty to provide pretrial detainees adequate medical care, and that this is true whether Collin County contracts out its health care responsibilities or provides them itself. *Id.* at \*6 (citing *Hare v. City of Corinth*, 74 F.3d 633, 638–39 (5th Cir. 1996) (en banc); *West v. Atkins*, 487 U.S. 42, 56, 108 S.Ct. 2250 (1988)). "As a result, Collin County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services." *Id.* (citing *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012)). Although the district court noted that "the Fifth Circuit has not expressly adopted this non-delegable duty doctrine in the context of a Section 1983 action," it nonetheless was persuaded by the "a robust consensus of persuasive authority" from other circuits that the doctrine should apply: "[W]hile Wellpath provides the medical care for Collin County's detainees, Collin County remains liable for any constitutional deprivations caused by its policies, practices, or customs." *Id.* at 6. The *Kent* court cited cases from the Sixth, Seventh, and Eleventh Circuits, as well as district court cases in the Fifth and Ninth Circuits. *See id.* at 6, 8.

In particular, the *Kent* court noted that the Seventh Circuit's decision in *King v. Kramer* specifically rejected the argument that the issue is one of respondeat superior rather than delegation: "The underlying rationale is not based on *respondeat superior*, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it." *Id.* at \*6

7

(citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705-06 (11th Cir. 1985));
*see also Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1250 (6th Cir. 1989)
(explaining that "the State (and here the County) retains responsibility despite
having contracted out the medical care of its prisoners"); *Rodriguez v. S. Health
Partners, Inc.*, No. 3:20-CV-0045-D, 2020 WL 7056336, at *13 (N.D. Tex. Dec. 2,
2020) ("[I]f the court were to ultimately conclude that Navarro County *did* delegate
policymaking authority to SHP, such a holding would not of itself preclude Navarro
County from also being held liable under § 1983."); *Steel v. Alameda County
Sheriff's Office*, 428 F.Supp.3d 235 (N.D. Cal. 2019) (based on terms of County's
contract outsourcing medical care to private company, private company had an
incentive to withhold hospitalization services to inmates, including the pregnant
plaintiff; county's outsourcing contract established an official policy of denying
hospital care to detainees).

The Eleventh Circuit's *Ancata* opinion, relied on by the Seventh Circuit in
*King*, is the seminal circuit decision addressing this issue. 769 F.2d at 705-06. In
*Ancata*, Broward County contracted with Prison Health Services, Inc. to provide
medical services for its jail. *Id.* at 701. The plaintiff alleged that the doctors and
nurses employed by Prison Health Services were deliberately indifferent to the
serious medical needs of a detainee who died from complications of leukemia,
having prescribed the detainee only over-the-counter pain relievers. *Id.* at 702.

The plaintiff in *Ancata* also sued Broward County and two sheriffs. *Id*. at 704. The governmental defendants successfully argued in the district court that the claims against them were improper because they were based on a respondeat superior theory. *Id.* The Eleventh Circuit reversed. The circuit court stated that the county's duty to provide medical care to incarcerated individuals is not absolved by contracting with a private entity such as Prison Health Services, and the county was liable for the policies of its contractor. *Id*. at 705-06. The court reasoned: "Although Prison Health Services has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service. In that sense, the county's duty is non-delegable. . . . Furthermore, if the county permitted the sheriff and/or prison health officials that it contracted with to establish such a policy or custom, it may also be liable. Such liability would not be based upon notions of respondeat superior. The liability would be a result of the county's own policy." *Id*. at 705-06 (intervening citations omitted). Finally, the circuit court stated, "[I]f, either expressly or by default, Broward County permitted others to decide or determine policy, it is liable for their actions if these policies prove unconstitutional." *Id*. at 706 n. 11 (citing *Wilson v. Taylor*, 733 F.2d 1539, 1545 (11th Cir. 1984) (holding that when a municipality gives a police chief the final authority to make a decision, *Monell* standards for official policy are satisfied).

As does Midland County in its brief, Denton County in *Kent* focused on the ultimate holding of the district court in *Rodriquez*,[2] cited in Appellants' main brief, in which the district court concluded that the plaintiff's allegations in that case were too conclusory to make out an official policy. The district court in *Kent*, without commenting on whether it agreed that the allegations *Rodriquez* were conclusory, nonetheless held that the allegations before it were not conclusory, and therefore the outcome was controlled by the rule applied by the circuit courts in *Ancata* and *King*. Specifically, the plaintiff in *Kent* alleged that in outsourcing medical care to Wellpath, Denton County adopted Wellpath's cost containment policy for reducing the costs for emergency medical care. Wellpath's policy defined "emergency medical care" as a "life or limb threatening illness or injury." *Kent*, 2022 WL 949963, at *7-8. Thus, the plaintiff alleged that "if the [Wellpath] staff does not determine that the inmate is about to lose their life or limb, then it does not qualify as an emergency medical care situation *under [Wellpath's] policy* and transport to offsite medical care will be denied." *Id.* at *8 (emphasis added). The district court determined that Collin County's adoption of Wellpath and its program was official county policy. *Id*. at *7.

---

[2] *Rodriguez v. S. Health Partners, Inc.*, No. 3:20-CV-0045-D, 2020 WL 7056336 (N.D. Tex. Dec. 2, 2020).

The *Kent* court added a proviso, absent from *Ancata* and *King*, that if the constitutional violation committed by a Wellpath employee did not directly flow from Collin County's policy, custom, or practice, then Collin County would not be liable. *Id.*at 7. But that was not the case where, as in the present case, the county adopted Wellpath's policies by engaging Wellpath to perform the County's nondelegable duties, and thereby clothed Wellpath with authority to make determinations as to a detainee's right to emergency medical care. *See id.* at *7-8.

Midland County attempts to wedge itself into this narrow proviso by arguing that Plaintiffs do not plead that Midland County delegated "final" decision making to Soluta. The is a semantic distinction. That Soluta made the final decisions concerning detainee healthcare is fairly subsumed in Plaintiffs' allegation that "Midland County entrusted or delegated healthcare . . . for Midland County inmates" to Soluta. (ROA.19-20 [¶ 4]) To entrust or delegate a function to another means that it is the delegee rather than delegator who makes the final decision. Additionally, the standard of review requires that the allegation be viewed in Plaintiffs' favor.[3]

Midland County further argues that a delegation theory requires the plaintiff to point to formal provisions in an outsourcing agreement demonstrating that the county has adopted its contractor's policies. But that is only one way in which the

---

[3] Even if this Court viewed it to be vital for Plaintiffs to expressly use the term "final," this would be a mere pleading defect that could and should be remedied by amendment.

plaintiff may demonstrate that a county was delegated policymaking authority to a contractor. Policymakers may choose to delegate policymaking authority to others, and may do so either overtly *or by acquiescence*. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010)("A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role."). Here, Midland County did both. It formally outsourced medical care to Soluta, and fully acquiesced in how Soluta delivered services to detainees. This includes Soluta's policy of falsifying medical records which purport to show medical care was provided when it was not.

Midland County also characterizes Plaintiffs' allegations of Soluta's falsification of medical records and its failure to provide treatment as a "single incident." Factually, this understates Plaintiffs' allegations. Plaintiffs allege dozens of incidents, as many as 60, which occurred to the same individual. Plaintiffs recount Ranger Gray's investigation showing that Hall attempted to obtain treatment nearly 60 times, and only on the two occasions where he was sent to a hospital were protocols somewhat followed. These two instances are clearly exceptions to the ordinary practice of Soluta personnel to wholly fail to use any instruments to evaluate Hall's breathing condition before or after the alleged treatment, and either

fail to document the visit altogether, or falsify records purporting to show that examinations were performed and readings obtained when they were not. The failure to record dozens of attempted procedures is just as misleading as recording inaccurate information. The sheer number of times Hall sought treatment is an obvious red flag that the procedure Soluta employed was providing little if any therapeutic value. Soluta's failures occurred over the course of a month, and involved at least six nurses. It is a reasonable inference that the practice of falsifying and failing to record interactions with patients seeking treatment did not suddenly begin with Hall's detention, but was ongoing before Hall was detained and continued after he died. Plaintiffs therefore do not allege a simple one-off incident. For purposes of establishing the existence of a custom or practice that has the effect of policy, it is inconsequential that a single individual was the victim of dozens of acts of misconduct.

Again, *Kent* is instructive. In response to the county's argument that the matter complained of was but a one-time incident for which it could not be held responsible, the court stated: "Kent does more than describe one tragic event. She plausibly alleges that Collin County and Wellpath had a policy—the Cost Containment Program—at the jail of refusing to transfer inmates to offsite medical providers despite the obvious need to do so unless there was a dire emergency." 2022 WL 949963, at *7. The court further concluded that the plaintiff plausibly pleaded facts

showing that the ongoing policy was a moving force in the plaintiff's injuries. *Id*. at *9-11.

Similarly, Plaintiffs plead that Hall's suffering and death was a result of ongoing policies developed through widespread practice and custom attributable to the County through its delegation of authority, and these policies were a moving force in causing Hall's condition to be unrecoverable without timely emergency intervention. *See City of Okla. City v. Tuttle*, 471 U.S. 808, 822, 105 S.Ct. 2427, 2435-36 (1985). ("Obviously, it requires only one application of [an unconstitutional] policy such as this to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.").

Moreover, Midland County's criticism of Plaintiffs' reliance upon *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985), is not well taken. This Circuit has recently relied on *Grandstaff* in *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 510 n.56 (5th Cir. 2022) and *Sanchez v. Young Cty., Tex.*, 956 F.3d 785, 793 (5th Cir. 2020), without any of the overlay Midland County attempts to ascribe to it. When as here multiple employees act in the same unconstitutional manner in response to the same incident, it is reasonable to infer that they are acting pursuant to well-known and accepted practice, rather than improvising. The group conduct of the six Defendants is comparable to that in *Sanchez* and *Grandstaff*, and similarly

Case: 22-50673    Document: 35    Page: 15    Date Filed: 01/27/2023


egregious. Here at least six nurses all acted similarly, failing to record numerous interactions with the patient, and falsifying others with respect to very critical health information. They made it appear as if Hall was responding well to treatment, when in fact was struggling to breathe and slowly dying. Moreover, Hall's death is a highly predictable result of Soluta's customs and practices. *See City of Canton*, 489 U.S. at 390; s*ee also Doe v. Dallas I.S.D.*, 153 F.3d 211, 217 (5th Cir. 1998).

Furthermore, the constitutional violation here is no less egregious than in *Grandstaff* merely because it involved nurses rather than police officers with guns. In *Grandstaff* six professional employees (police officers) participated in the misconduct (four of which were sued in *Grandstaff*). *Grandstaff*, 767 F.2d at 165. In the present case at least six professional employees, nurses, all participated in the constitutional misconduct that led to Hall's death. Hall is no less dead than Mr. Grandstaff merely because the misconduct in this case concerns deliberate indifference to a detainee's safety and serious medical needs rather than the wrongful use of deadly force. *Grandstaff* cannot be distinguished based upon egregious facts.

Midland County further chooses to ignore Plaintiffs' conditions-of-confinement allegations, arguing that Plaintiffs plead only an episodic event. But this is not so. The same facts may raise both theories.[4] A policy of failing to record

---

[4] Of course, as the Supreme Court has stated, the plaintiff must only plead facts which support a theory; "it is unnecessary to set out a legal theory for the plaintiff's claim for relief." *Johnson v.*

patient interactions and falsifying medical information subjects detainees to conditions of confinement which jeopardize their health and safety. *Kent* is again instructive on this issue: "[T]he Court concludes that Kent has stated a plausible *Monell* claim under Section 1983 for both unlawful conditions of confinement and injurious episodic acts and omissions against Collin County. *See United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) (explaining that our adversarial system of adjudication 'is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief' (cleaned up)).' " 2022 WL 949963, at *11 n.7.

Midland County also invites the Court to review Stickel's order of release in an attempt to provide an alternative explanation to why the County suddenly released Hall from custody after he was transported to the hospital in critical condition. The order of release in no way contradicts Plaintiffs' allegations; it confirms them. That the County obtained a judicial order authorizing Hall's release is a mere ministerial act. The terms of the order, however, confirm that the County was attempting to avoid paying for Hall's healthcare costs *for the damage its employee and contractors caused*, by having Hall released for treatment then requiring him to return if he

---

*City of Shelby, Miss.*, 135 S.Ct. 346, 347 (2014) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1219, at 277-278 (3d ed. 2002)).

happened to survive. The County cynically shifted costs that were its responsibility to Hall, or the hospital. Furthermore, the release prevented an autopsy from being conducted because the medical examiner did not consider Hall to be in custody while in the hospital. Finally, it is inconsequential that the County did not release Hall on July 1. There is an obvious and significant difference in the cost from a prolonged hospital stay for a critically ill patient and that of a short outpatient visit to an emergency room as occurred on July 1. That the County released Hall on July 11 when it was faced with significant healthcare costs as the result of its contractor's practices, and likely a deceased detainee, demonstrates that the County was attempting to avoid its responsibility for providing medical care to Hall, as well as attempting to frustrate an autopsy and deflect responsibility for Hall's suffering and death away from the County.

II.    Appellees' alternative narrative is not supported by the Complaint and violates the standard of review.

In an attempt to create an alternative narrative which Plaintiffs did not plead, Defendants improperly ask the Court to infer erroneous and unfounded allegations in violation of the standard of review. Much of Defendants' alternative narrative is built upon the erroneous assumption that the falsified SVN Treatment Flo-Sheet is trustworthy. Thus, over 20 times Defendants cite to the fraudulent Flo-Sheet at ROA.30 to support Defendants' alternative narrative. The erroneous assumption that the falsified Flo-Sheet is reliable and trustworthy undercuts Defendants' alternative

narrative at the outset, just as it does the district court's analysis. Defendants' suggestion that the dates and times can be trusted, even though the readings are fabricated and dozens of visits were not recorded at all, is untenable, and defies ordinary experience.

The same is true of the statements Defendants reply upon which the Nurse-Defendants' made to Ranger Gray for his investigation. Plaintiffs plead that these statements are filled with lies and dissembling intended to deflect responsibility from Defendants' wrongdoing. *E.g.*, ROA.32-33 (¶ 29: ("[Nurse] Adesomi, attempting to defend herself, launched into narratives designed to divert Ranger Gray's attention from Nurse Adesomi. . . . [B]oth [Nurse Adesomi and Nurse Dunston] knew that such assertions were false."); ROA.38 (¶ 41: ". . . Nurse Forbush was lying about Savion improving. . . . Nurse Forbush participated in, and knew that others participated in, falsifying the SVN Treatment Flowsheet for Savion [Hall]."); ROA.42 (¶ 46: "Nurse Forbush once again attempted to deflect liability from himself by launching into a skewed and false narrative . . ."); ROA.48 (¶ 61: ". . . [Nurse] Okeri was lying to Ranger Gray."); ROA.61 (¶ 82: "All Individual Defendants knew that Savion was at severe risk of anoxic brain injury, other injury, and/or death if those Defendants chose not to treat and/or assess Savion or, in the alternative, pretended as though they had treated and/or assessed Savion and wrote, or allowed to be written, false entries into medical records.").

Likewise, while Plaintiffs plead that Jailer Stickel's post hoc statements admit that he should and could have done more, Plaintiffs do not allege or admit that *the entirety* of his statements are true. (ROA.55-59 [¶¶ 76-77]) Stickel's statements betray his knowledge of a life threatening emergency condition, and his ability to respond to it, even as he attempts to excuse and minimize his conduct. Plaintiffs may rely on this evidence without accepting Stickel's rationalizations for why he failed to act on his knowledge. It is not the law, as Appellees claim, that if a party relies on some parts of a statement to show the defendant's knowledge of certain facts, then the party is required to accept the entirety of the statement in which the defendant attempts to downplay their significance and excuse his conduct. If the rule was as Appellees pose, a defendant could merely write a self-serving statement in every case to excuse his misconduct, and the plaintiff would be required to accept it. That is decidedly not the law.

Thus, the various claims and assertions made by the Defendants are by no means "facts" which Plaintiffs have admitted merely because Plaintiffs recount Defendants' stories in the Complaint. Untrustworthy rationalizations designed to minimize wrongful conduct do not serve to exculpate Defendants. Rather, it is the comparison of their statements with other evidence that reveals the duplicity of the Defendants' statement, and which further supports a finding of deliberate indifference.

Appellees' statement of the case in their brief begins with a false assumption and assertion, in clear derogation of the standard of review, that Hall received almost daily breathing treatments. (Appellee Brief at 4, citing ROA.29-30, 37, 41, 56) Nowhere do Plaintiffs plead that Hall actually received the breathing treatments he sought. Like the district court, Defendants rely on the falsified SVN Treatment Flo-Sheet (ROA.29-30), buttressed by the false statements of Nurse Flatbush (ROA.37, 41) and Jailer Stickel (ROA.56) in which these Defendants seek to minimize and excuse their wrongful conduct. That the County's delegees made false records of alleged treatments, then attempted to mislead investigators as to their actual conduct, is no support for the conclusion that Hall received *any* therapeutic treatment while detained, much less daily treatment. That Hall repeatedly *sought* treatment is undisputed. That he actually received it, however, is very much disputed.

For example, it is unknown if Hall received any medicine, or whether he received the correct medicine and dosage each time he sought treatment. Nor is it known if the equipment was operated or functioned properly. What is known is that the County delegated its nondelegable duty to provide healthcare for detainees to persons who systematically created false medical records of treatment, then lied about it. Further, because Hall was stable upon admission to the jail, but steadily deteriorated and died within a month, one may readily infer that medication was *not* administered and/or not administered properly on a near daily basis, the opposite of

what Defendants claim in their brief. This likely also explains why Hall so frequently *sought* treatment.

Ranger Gray's reference in his report to approximately 60 treatments refers only to video evidence showing that Hall sought treatment, which Gray recounted for the purpose of demonstrating widespread disregard of medical protocols and falsified accounts of procedures. (ROA.59-60 [¶ 79]) He does not purport to conclude that Hall ever received correct or therapeutic treatment. Consequently, the jail video records only Hall's many attempts to get treatment; it does not confirm that he received any therapeutic treatment. The extent to which treatment was not administered or administered incorrectly is an issue for discovery, not a matter that can be resolved on the pleadings.

For their alternative narrative, Defendants hypothesize that a treatment regimen to which Hall had previously responded prior to his detention for unknown reasons suddenly stopped working immediately after he was detained. One would expect just the opposite to have occurred. In a custodial environment where Hall should have received proper care and nourishment, and there would be no occasion for him to forget or miss his medication, Hall's health should have responded positively. That the 30-year-old instead died, if not conclusive of Defendants' systematic deliberate indifference to Hall's serious medical needs throughout his detention, is at least a fact reasonably inferred.

Tellingly, as Defendants allowed Hall's condition to deteriorate, he was taken to a hospital emergency department on July 1. (ROA.27 [¶ 19]) Hall apparently responded to treatment in the emergency room because he was discharged with instructions that he should be returned to the emergency department for further evaluation if his symptoms worsened. (ROA.27 [¶ 19]) Unfortunately, Defendants ignored these instructions, and Hall's condition again deteriorated after he was returned to the jail. (ROA.27 [¶ 19]) At least one reasonable inference from these facts is that Hall was being systematically mistreated at the jail, rather than treated.

As discussed in Appellants' main brief, it is misleading to say that Hall received three breathing treatments during Stickel's shift because, as discussed *supra*, it is unknown whether Hall received any therapeutic breathing treatments before he was seen by Dr. Willingham. In his post hoc statement, Stickel belatedly claims that he was told Hall was at medical when Stickel started his shift at 11:00 p.m. (ROA.55-56) This does not coincide with the time on the fraudulent Flo-Sheet, which purports to record a visit an hour later. (ROA.30) And of course, what treatment Hall may have received at that time, if any, is unknown. Additionally, it is unknown whether Hall visited medical around 4:00 a.m., and if he did, whether he interacted with any medical personnel or received any therapeutic treatment. Again, the only reference to such a visit is the fraudulent Flo-treatment sheet (ROA.30), which is untrustworthy. Finally, the so-called third treatment at the end of Stickel's

shift was due to the intervention of another jailer, when it was then too late to save Hall's life.

Moreover, it is also simply incorrect to claim that Stickel relied on medical advice. Plaintiffs make no such allegation in their Complaint, nor is any such allegation properly inferred. Even in Stickel's reports he never claims to have talked to any medical employee, nor did he ever claim to have reported his observations of Hall's serious medical condition to anyone prior to the end of his shift. Stickel merely claimed in his post hoc reports to have known what he *claims* was an infirmary policy to wait 4-5 hours between breathing treatments. It is unknown whether any such policy actually existed or whether anyone ever told Stickel that it did. We do know, however, the Stickel was wrong, or lying, about what he claimed to know, because Dr. Willingham in the infirmary did in fact see Hall an hour and a half before 8:30 a.m., the time that Stickel later claimed that Hall had to wait before going to medical. (ROA.58) Either there was no such policy, or it did not apply to Hall because he was experiencing an obvious medical emergency. At bottom, Stickel's claim to have relied upon medical advice is nothing more than unsupported rationalizations which he belatedly offered in his reports to excuse and minimize his wrongful conduct.

Defendants' wholesale abandonment of the standard of review is most evident in the shocking assertion that it was permissible for Stickel to ignore Hall's pleas for

assistance because Hall would have died anyway. Defendants of course do not cite to any such allegation in the Complaint, because there is none. Plaintiffs nowhere allege that Hall would have died even had Stickel timely called a medical emergency and obtained assistance for Hall.

Just as importantly, as this Court addressed in *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 422–23 (5th Cir. 2017), whether a detainee lives or dies is not the standard for liability; a plaintiff may also recover for pain and suffering caused by the delay or denial of treatment. Detention officers have a constitutional duty to respond to the serious medical needs of inmates in their charge to avoid pain and suffering, both physical and emotional. Defendants argument is no better than saying Stickel need not have stopped an inmate from brutally assaulting Hall throughout his Stickel's shift because Hall would have died anyway.

Defendants argue for a perverse rule that would allow the worst of the worst detention officers to avoid liability for permitting all manner of harm to befall a detainee as long as they ensured that the detainee ultimately died. It is a preposterous notion that is proscribed by *Alderson*. Even if there were facts to support the argument that because of the County's indifference to Hall's serous medical needs that his condition had become unrecoverable by the time Stickel assumed his shift on July 11, Plaintiffs would still have a cause of action against Stickel for the additional pain and suffering he caused Hall. *See id.*

Defendants further seem to argue that Stickel did not know that Hall was suffering a medical emergency because Stickel was misled by the false information in the Flo-Sheet purporting to show normal oxygen levels, because Plaintiffs allege that falsifying medical records "made it appear to anyone reviewing those records, such as Doctor Willingham,[5] that Savion was doing well with his treatments." (ROA.42 [¶ 46]) Defendants take Plaintiffs' allegation out of context. The allegation concerns how a doctor would be misled into believing that Hall was responding well to therapy solely from reviewing the record, not what could be observed from personal observation. Moreover, there is no allegation in the Complaint that Stickel reviewed the false Flo-Sheet oxygen readings or was misled by them. Nor do his statements claim that his conduct was based on the false oxygen levels.

Defendants also argue that Stickel could not tell that Hall was experiencing a medical emergency because, Defendants argue, Dr. Willingham must not have recognized an emergency because he first provided Hall with a breathing treatment before sending him to a hospital. The inference Defendants allege is unreasonable and violates the standard of review. It is hardly surprising that Dr. Willingham spent a few minutes attempting to stabilize Hall before sending him to a hospital. There is

---

[5] Defendants also state, without support, that Dr. Willingham was the supervisor of the six nurse Defendants. Plaintiffs allege that Dr. Willingham worked with Soluta and happened to be on duty at the jail on July 11. Plaintiffs do not allege that he was the day-to-day supervisor for these Defendants.

no support for Defendants' allegation that Dr. Willingham did not recognize the emergency.

Additionally, Defendants' assertions that Stickel did not recognize the emergency is at odds with Stickel's admissions and observations in his statements. By his own admission, Stickel observed that Hall had great difficulty breathing which continued for hours; he saw that Hall could not stand on his own; and he knew Hall complained that he "was not gonna make it." Furthermore, it is apparent that Stickel also contemplated that Hall could stop breathing and lose consciousness at any time, because Stickel made the decision to defer declaring an emergency until that happened, and periodically observed Hall to see if he had stopped breathing or passed out. This clearly admits Stickel's observation of a medical emergency which even a layperson would recognize as such.

Engaging in further sophistry, Defendants also argue that Stickel did not refuse treatment for Hall until Hall passed out, because Hall never passed out. The point of course is that Stickel made the decision to refuse to call for emergency assistance unless Hall became unresponsive, lost consciousness, or stopped breathing. It was Stickel's refusals over the course of his shift that allowed Hall's condition to worsen to the point where, as even Defendants recognize, his condition became unrecoverable. The relevant fact is not whether Hall eventually passed out, but that Stickel refused emergency treatment for a dying man.

## CONCLUSION

Appellants believe that the remainder of Appellees' arguments were anticipated and addressed in Appellants' main brief, and fail to offer support justifying affirming the dismissal orders of the district court. Appellants pray that the district court's rulings granting the motion to dismiss for each Defendant-Appellee be reversed and the case be remanded for further proceedings.

Respectfully submitted,

/s/ Bruce K. Thomas
Bruce K. Thomas
State Bar No. 19844300
Law Office of Bruce K. Thomas
12900 Preston Rd., Suite 590
Dallas, Texas  75230
Phone/Fax:  214/296-9650
bthomas@bthomaslaw.com

T. Dean Malone
Texas State Bar No. 24003265
dean@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:  (214) 670-9989
Telefax:     (214) 670-9904

**ATTORNEYS FOR PLAINTIFFS-APPELLANTS**

## CERTIFICATE OF SERVICE

I certify that on January 27, 2023, the foregoing document was served, via the

Court's CM/ECF Document Filing System, upon the following registered CM/ECF

users:

> **R. LAYNE ROUSE**
> **lrouse@shaferfirm.com**
> **MILES NELSON**
> **mnelson@shaferfirm.com**
> **SHAFER, DAVIS, O'LEARY &**
> **STOKER**
> **P.O. Drawer 1552**
> **Odessa, TX 79760-1552**
> *Counsel for Defendants-Appellees*

/s/ Bruce K. Thomas
Bruce K. Thomas

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 5772 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 (Version 2205) in Times New Roman 14-point font, and 12-point font for footnotes.

/s/ Bruce K. Thomas
Bruce K. Thomas